Jose ALDASORO and Domingo
Enriquez, Plaintiffs,

v.

John KENNERSON, Officially as the Reg-
istrar of Voters of Imperial County, and
El Centro School District, Defendants.

Civ. No. 91–1410–B (LSP).

United States District Court,
S.D. California.

Aug. 4, 1995.

Pauline Gee, California Rural Legal Assistance, El Centro, CA, for plaintiffs.

John McDermott, Cadwalader, Wickersham and Taft, Los Angeles, CA, for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW;
JUDGMENT

BREWSTER, District Judge.

This case involves a challenge by Hispanic plaintiffs to the at-large election system of the El Centro Elementary School District Board of Trustees ("El Centro") under Section 2 of the federal Voting Rights Act, 42 U.S.C. Section 1973. Hispanic plaintiffs allege that El Centro's at-large election system violates Section 2 of the Voting Rights Act, both because it "dilutes" the ability of Hispanic voters to elect candidates of their choice and also because it impairs their ability to "influence" elections.

■ Vote dilution occurs when a minority group is unable to elect candidates at-large whom it could elect within a single member district where the group is a majority. *Thornburg v. Gingles,* 478 U.S. 30, 68, 106 S.Ct. 2752, 2775, 92 L.Ed.2d 25 (1986). *Thornburg,* the leading case interpreting Section 2, sets out the following three preconditions which minority plaintiffs must establish to prove vote dilution:

1. The minority group is sufficiently large and geographically compact to constitute a majority in a single member district.

2. The minority group is politically cohesive.

3. The white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, to usually defeat the minority's preferred candidate.

*Id.* at 48–50, 106 S.Ct. at 2765–66. If all three preconditions are established, the Court then must consider, under a "totality of circumstances" analysis, whether a current condition of vote dilution exists.

After considering the evidence at trial as well as the legal memoranda submitted by the parties and arguments of counsel, the Court, having filed its written Decision on November 1, 1994, now hereby makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. El Centro Elementary School District is located in Imperial County. Since approximately 1906, it has employed an at-large electoral system to select its Board of Trustees, which now has five members. Every voter has the opportunity to cast a ballot for all five Trustee seats. There are no districts. This system is authorized by state law. Cal. Educ.Code §§ 35012, 5019, 5020, 5030.

2. Elections are held every two years in odd-numbered years and staggered so that either two or three seats are elected every two years. The two or three candidates receiving the two or three highest vote totals of all candidates running are elected to four year terms of office. There is no majority vote requirement and no runoff election.

3. Voters may cast two or three ballots in each election for the two or three seats up for election, but there is no "anti-single shot" requirement[1] that a voter must cast as many ballots as seats up for election in order for his or her vote to count. They may "bullet vote," or cast just one ballot if they choose to do so. Thus, Hispanics may vote once for a sole Hispanic candidate and deny Anglo candidates the other vote[2], thereby improving the chances of electing an Hispanic candidate. 9/22/94 Trial Transcript ("Tr."), Dr.

**1.** *City of Rome v. United States,* 446 U.S. 156, 183–84, esp. n. 19, 100 S.Ct. 1548, 1564–65, esp. n. 19, 64 L.Ed.2d 119 (1980), cited in *Thornburg v. Gingles,* 478 U.S. 30, 38, n. 5, 106 S.Ct. 2752, 2760, n. 5, 92 L.Ed.2d 25; *Westwego Citizens for Better Government v. City of Westwego,* 946 F.2d 1109, 1113, n. 3 (5th Cir.1991); *see also Badillo v. City of Stockton,* 956 F.2d 884, 889 (9th Cir. 1992).

**2.** See *Thornburg* at 38, n. 5, 106 S.Ct. at 2760, n. 5; *City of Rome,* 446 U.S. at 184, n. 19, 100 S.Ct. at 1565 n. 19 (1980).

Rabinovitz, p. 16; 10/12/94 Tr., Dr. Brischetto, p. 85.

4. The Hispanic population of El Centro has increased substantially since 1970. The 1990 Census indicated that the City of El Centro had a total population of 31,384 people, 65% of whom were Hispanic. Its demographic composition was as follows:

| | | |
|---|---|---|
| Anglo | 8,890 | 28.3% |
| Black | 1,186 | 3.8% |
| Asian/PI | 642 | 2.0% |
| Other Race | 184 | 0.6% |
| Hispanics | 20,482 | 65.3% |
| Total | 31,384 | 100.0% |

Ex. EU. The boundaries of the El Centro Elementary School District ("ECESD") are larger than but include the entire City. The Elementary School District has a total population of 32,811, of whom 64.9% are Hispanic, 28.7% are Anglo, 3.7% are Black and 3.5% other. Ex. EV. The boundaries of the Central Union High School District include all of the City, all of the Elementary School District and other territory as well. The City, Elementary District and High School District all employ the same type of five member, staggered term, plurality win, at-large election system that permits bullet voting.

5. The Hispanic population is disproportionately under the age of 18 and disproportionately noncitizen. Hispanics were 59% of the voting age population in El Centro School District in 1990 and 47% of its voting age citizens. By 1994, Hispanics had become a majority of the voting age citizens in El Centro Elementary School District.[3]

6. In 1975 Raul Aragon was the first Hispanic candidate to be elected to the El Centro School District in a contested election. He was elected to a seat common to the El Centro Elementary School District and the Central Union High School District. In 1979 the two Boards separated. In 1983 the El Centro School District Board was expanded from three seats to the current five Board seats.

7. Since 1983, there have been 17 Trustee seats elected on the Elementary Board. Seven were filled by minorities, three by Hispanics and four by Blacks. The Elementary School Board election history since 1983 is as follows:

a. In 1983 two (2) Hispanics—Rae Perez and Rebecca Montiel—were elected to the ECSD's Board. The 1983 election was basically an uncontested election. Montiel lost in 1985 and Perez lost in 1987 when they ran for re-election in contested elections. (Admitted Fact # 6—Pretrial Order of 1/11/93, p. 3).

b. Since 1983 through 1991 there have been eight (8) Hispanic surnamed candidates who have run for the ECSD Board in contested elections in 1985, 1987, 1989, 1990, 1991. None of the Hispanic surnamed candidates won in any of those elections. (Admitted Fact # 7—Pretrial Order of 1/11/93, p. 3).

c. In 1993, three (3) Hispanic surnamed candidates ran for the ECSD Board in a contested election. One of the Hispanic surnamed candidates won one of the two seats.

d. In the ESCD's 87 year history, only 2 Mexican American candidates have ever won in a racially contested election: Mr. Raul Aragon in 1975 and Mr. Efrain Silva in 1993.

---

3. According to the 1990 census data the ECSD population who are 18 years of age or older is 21,100. The following is the 1990 Census data of 18 + population by race/ethnicity or voting age population (VAP) of ECSD:

| Total VAP (18 +) | White | Hispanic | Black | Asian/PI | Other |
|---|---|---|---|---|---|
| 21,100 | 7,184 (34%) | 12,451 (59%) | 6846 (4%) | 481 (2.3%) | 138 (.7%) |

(Exh. EW and Exh. 11, p. 14)

## SCHOOL BOARD ELECTIONS

| CONTEST | MINORITY CAND. | OUTCOME | NONMIN. CAND. | OUTCOME |
|---|---|---|---|---|
| '93 SB | Silva (H) | W–1,536 | Von Flue | W–1,948 |
| | Rodriguez (H) | L–1,168 | Luke | L–1,346 |
| | Rutledge (B) | L–738 | | |
| | Bustamante (H) | L–665 | | |
| '91 SB | Newton* (B) | W–1,354 | Hull | W–1,893 |
| | Esperanza (H) | L–983 | Arnold* | W–1,518 |
| | Banks (H) | L–859 | Yates | L–418 |
| | Whisler (A) | L–350 | | |
| | Perez (H) | L–1,141 | | |
| | Osa (H) | L–988 | | |
| '90 SB | Newton (B) | W–2,697 | Carson | L–1,300 |
| | Hernandez (H) | L–756 | Gonzalez | L–180 |
| '89 SB | Osa (H) | L–612 | Hamilton* | W–1,723 |
| | | | Duggan | W–1,455 |
| | | | Douthitt | L–1,081 |
| | | | Anderson* | L–954 |
| '87 SB | Berryman* (B) | W–1,465 | Le Pere* | W–1,860 |
| | Perez* (H) | L–1,273 | Arnold | W–1,774 |
| | | | Gotti | L–882 |
| | | | Lester | L–947 |
| '85 SB | Montiel* (H) | L–1,034 | Anderson* | W–1,935 |
| | | | Hamilton | W–1,799 |
| '83 SB | Berryman* (B) | W–1,393 | Vlasic | L–836 |
| | Perez (H) | W–980 | | |
| '83 SB (Meas.E) | Montiel (H) | W–1,174 | Le Pere* | W–1,353 |

(W = Won;  L = Lost) (*Incumbent)

---

Exs. EA, p. 1, and FB. Thirteen Hispanics have run for the El Centro Elementary School District ("ECESD") Board since it became a separate district. Two were elected in 1983, in basically uncontested elections. Efrain Silva won in 1993.

8. Hispanics and Blacks also have been elected to the City Council and High School District Board of Trustees. Since the 1960's, twelve Hispanics and five Blacks have been elected to the City Council. Four Hispanics but no Blacks have been elected to the High School District Board. Minorities elected to the City Council and High School District Board are as follows:

## HISPANIC ELECTORAL SUCCESS IN EL CENTRO

### CITY COUNCIL AND HIGH SCHOOL DISTRICT ELECTIONS

| Date | Jurisdiction | Successful Hispanic Candidate(s) |
|---|---|---|
| 1975 | High School/ Elem. School Joint Board | Aragon |
| 1979 | High School | Aragon |
| 1988 | High School | Aragon |
| 1992 | High School | Villanueva |
| 1970 | City Council | Arellano |
| 1972 | City Council | Alarcon |
| 1976 | City Council | Alarcon |
| 1980 | City Council | Beltran |
| 1980 | City Council | Alarcon |
| 1984 | City Council | Beltran |

| Date | Jurisdiction | Successful Hispanic Candidate(s) |
|---|---|---|
| 1985 | City Council | Gonzalez |
| 1985 | City Council | Dhillon (E.Ind./Hisp.) |
| 1987 | City Council | Gonzalez |
| 1989 | City Council | Dhillon (E.Ind./Hisp.) |
| 1991 | City Council | Terrazas |
| 1993 | City Council | Dhillon (E.Ind./Hisp.) |

## BLACK ELECTORAL SUCCESS IN

## EL CENTRO CITY COUNCIL ELECTIONS

| Date | Jurisdiction | Successful Hispanic Candidate(s) |
|---|---|---|
| 1964 | City Council | McGee |
| 1968 | City Council | McGee |
| 1985 | City Council | Sanders |
| 1987 | City Council | Sanders |
| 1991 | City Council | Sanders |

Exs. ER; FB.

9. Plaintiffs have created a single member district in which Hispanics were 53% of all registrants there as of 1990. Ex. EZ. Although Hispanics could not have formed the required single member district for the 1985 and 1987 elections, there is no dispute that Hispanics satisfy the first *Thornburg* precondition *currently* or that Hispanics are a majority of the population, voting age population, and voting age citizen population in plaintiffs' proposed single member district, both currently and at least since 1985.

10. Hispanics in El Centro generally, though not always, are politically cohesive in support of Hispanic candidates and there is no dispute that plaintiffs satisfy the second *Thornburg* precondition. Hispanics in El Centro are predominantly of Mexican descent.

11. Anglos in El Centro generally, though not always, are politically cohesive in support of Anglo candidates. Blacks too are politically cohesive in support of Black candidates. Thus, voting in El Centro elections is racially polarized in the sense that racial and ethnic groups generally vote differently from each other, each typically preferring candidates from their own group to candidates from the other two groups.

12. White bloc voting, however, did not defeat the preferred candidate of Hispanic voters in the elections of 1989, 1990, 1991 and 1993. Only in 1985 and 1987 did Anglo bloc voting defeat the preferred candidate of Hispanic voters. In those two elections, however, there was no vote dilution because Hispanics were not able to create a single member district in which they had the ability to elect. Hispanic population, registration and turnout has been increasing rapidly. Indeed, Hispanics are now a majority of the voting age citizens in El Centro, and currently have the ability to elect at-large. 9/21/94 Tr., Dr. Morrison, p. 111; 9/22/94 Tr., Dr. Rabinovitz, pp. 49, 59; 9/20/94 Tr., Dr. Klein, pp. 102–103. Plaintiffs therefore did not satisfy the third *Thornburg* precondition nor demonstrate a current condition of vote dilution or inability to elect at-large.

13. Group voting preferences were determined primarily through bivariate ecological regression analyses, multivariate ecological regression analyses, and an exit poll for the November, 1993 elections. All experts for both sides agreed that these statistical methodologies were not precise and provided only "estimates" of each group's voting behavior.

14. Plaintiffs initially relied on a bivariate ecological regression analysis to estimate Hispanic and nonHispanic voting behavior, but this method of analysis sometimes result-

ed in Hispanics preferring Black candidates who were elected over Hispanic candidates who were not elected. *See, e.g.,* Ex. 53, p. 66 (Hispanics prefer Newton to Hernandez in 1990), p. 74 (Newton first preference in 1991); Ex. EA, pp. 4–5 (Hispanic second preference in 1993 was Rutledge). Plaintiffs' experts then concluded that the bivariate analyses produced biased results. 1/22/93 Tr., Burton, p. 22. Ecological regression makes a key assumption that a group's voting preferences are unrelated to where they live, that Hispanic voters will support Hispanic candidates at the same level, whether Hispanics are 10% of the voters in a precinct or 60%. Plaintiffs' experts labeled this assumption "minimal correlated error" (any variation is not systematically related to race); defense experts labeled it the "constancy assumption." 1/22/93 Tr., Dr. Burton, pp. 29, 85, 95; 9/16/94 Tr., Dr. Klein, pp. 86–88. The bivariate analyses which combine Blacks and Anglos into a single "nonHispanic" category assumes that Blacks and Anglos vote alike. Blacks, however, often voted differently than Anglos, violating the principal assumption of ecological regression and producing biased estimates. 9/16/94 Tr., Dr. Klein, pp. 176–177; 9/20/94 Tr., Dr. Klein, pp. 21–29; 2/2/93 Tr., Dr. Loewen, pp. 183–189; 2/3/93 Tr., Dr. Loewen, pp. 81–83.

15. Plaintiffs' experts then developed a multivariate analysis that divided the electorate into three groups: (1) Hispanics, (2) Blacks and (3) Anglos and all others (Asians, Native Americans—everyone not Hispanic or Black). Plaintiffs' experts regarded multivariate analysis as more accurate than bivariate analysis for El Centro elections. Defense expert Dr. Klein also agreed that, if one relies on ecological regression, multivariate is better than bivariate. In both the bivariate and multivariate analyses, Hispanic voters were identified by comparing registration and voting lists to the U.S. Census Bureau's Index of Spanish surnames. In the multivariate analyses, nonHispanics were divided into Blacks and Anglos based on their respective share of the voting age population in each precinct based on the 1990 Census. 9/16/94 Tr., Dr. Klein, pp. 135–136.

16. Plaintiffs' expert Dr. Burton produced two tables of primary importance for each election studied from the ecological regression analyses. Ex. 53, pp. 38–79. One table (the "f" series) estimates the percentage of all Hispanics (or Anglos or Blacks) who signed in at the polls who voted for a particular candidate. This table includes those who signed in at the polls and may have voted in other elections on the ballot but did not vote ("rolled off") in the Elementary School Board election. The other table (the "g" series) estimates the percentage of all votes actually cast by a group that were voted for a particular candidate, thus eliminating rolloff. Plaintiffs' multivariate analyses did not consider absentee ballots and for the elections in 1985 through 1991 used only the 19 precincts common to both the City and the Elementary School District (thus excluding three precincts outside the City boundaries in which only some of the voters were eligible to vote in the ECESD elections). Ecological regression analyses were done for City Council and High School District elections as well as for Elementary District elections, using only the 19 common precincts. Ex. EI. Dr. Brischetto's exit poll for the November, 1993 election also used these 19 precincts in analyzing School Board and City Council elections for that year.

17. Plaintiffs' experts also presented some secondary statistical evidence that they did not emphasize, namely homogenous precincts, overlapping percentages, complementary percentages and correlation analysis. This evidence does not lead to different conclusions about group voting preferences. The precinct and percentages analysis are mainly useful for undisputed Anglo voting patterns as there are no homogenous Hispanic precincts. The correlation statistics were produced only for the Hispanic-nonHispanic bivariate relationship which plaintiffs' experts testified was skewed. 2/2/93 Tr., Dr. Loewen, p. 183; 2/3/93 Tr. Dr. Loewen, pp. 81, 83. Plaintiffs' expert Dr. Loewen also admitted that correlations are insufficient to establish racially polarized voting or voting preferences, and not the best way to prove racial bloc voting. 2/2/93 Tr., Dr. Loewen, pp. 20, 25, 175–178, 183; 2/3/93 Tr., Dr. Loewen, pp. 81–83.

*The 1985 and 1987 Elections*

18. In 1985, two Anglos, John Anderson and Jim Hamilton, and one Hispanic, Rebecca Montiel, ran for the two seats up for election on the Elementary School Board. The two Anglos won:

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Jim Hamilton (W) (non-Hispanic) | 62.2 | 52.0 | 33.4 |
| John Anderson (W) (non-Hispanic) | 70.9 | 23.2 | 31 |
| All non-Hispanic | 133.1 | 75.2 | 64.4 |
| Rebecca Montiel (Hispanic) | 23.4 | 40.7 | 58.8 |
| Rollon | 156.5 | 115.9 | 123.2 |
| Percent not cast for this election (200% possible) | 43.5 | 84.1 | 76.8 |

W = won election
Table 1f, Ex. 53, p. 45.

---

19. In the multivariate analysis, Hispanic voters preferred Montiel and Hamilton. 58.8% of all Hispanics who went to the polls cast a ballot for Montiel, 33.4% for Hamilton. Ex. 53, Table 1f, p. 45. The bivariate analysis generated the same preferences. Black voters preferred Hamilton (52%) and Montiel (40.7%). Anglo voters preferred Anderson (70.9%) and Hamilton (62.2%). Thus, Anglos elected both their preferences who were Anglo, but Hispanics did not elect their first preference Montiel who was Hispanic. White bloc voting defeated the preferred candidate of Hispanic voters.

20. In the 1987 election, three seats were up for election. Six candidates ran, four Anglos (Arnold, Gotti, Le Pere and Lester), one Black (Berryman) and one Hispanic (Perez). Arnold, Le Pere and Berryman won. Perez finished fourth, 190 votes behind Berryman:

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Margaret Gotti (non-Hispanic) | 23.1 | 12.2 | 34.9 |
| Kathy Arnold (W) (non-Hispanic) | 65.8 | 26 | 13.8 |
| Charles Le Pere (W) (non-Hispanic) | 60.2 | 18.7 | 41.9 |
| Stephen Lester (non-Hispanic) | 31.7 | 0.2 | 22.3 |

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Orchard Berryman (W) (African–American) | 38.7 | 90.8 | 33.1 |
| All non-Hispanic | 219.5 | 147.9 | 146 |
| Aurelia Perez (Hispanic) | 28.6 | 35.4 | 63.4 |
| Rollon | 248.1 | 183.3 | 209.4 |
| Percent not cast for this election (300% possible) | 51.9 | 116.7 | 90.6 |

W = won election
Table 2f, Ex. 53, p. 53.

21. Hispanics preferred Rae Perez, Charles Le Pere and Margaret Gotti. Blacks preferred Orchard Berryman, Rae Perez and Kathy Arnold. Anglos preferred Arnold, Le Pere and Berryman, all of whom won. Ex. 53, Table 2f, p. 53. Thus, white bloc voting defeated the first preference of Hispanic voters.

22. In these two elections, however, Hispanics were not an effective voting majority able to elect in plaintiffs' single member *Thornburg* district. Hispanics were not a registered voter majority in 1985 (46.4%) and did not become a registration majority until 1987. Ex. EZ. Hispanics were only 36% of those turning out to vote in plaintiffs' *Thornburg* district in 1985, 39% in 1987. Ex. EZ. Plaintiffs' expert Dr. Loewen admitted that in 1985 the most Hispanic precinct was only 40% Hispanic in turnout in that election. 2/3/93 Tr., Dr. Loewen, pp. 78–79. Hispanics were not sufficiently large nor geographically concentrated to be able to elect their preferred candidate in these two elections. Thus, factually, there was no vote dilution in the 1985 and 1987 elections. These elections are useful only to the extent that they demonstrate Hispanic political cohesion and white bloc voting. They do not show vote dilution then, nor are they an accurate measure of the ability of Hispanics to elect at-large *today*, in view of the dynamic demographic change that has occurred in El Centro since 1985.

### The 1989 Election

23. In the 1989 election, five candidates, including incumbents Anderson and Hamilton, ran for the two seats up for election. Four were Anglo, and one was Hispanic, Larry Osa. The two winning candidates were Lucille Duggan and Jim Hamilton, both Anglo:

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Lucille Duggan (W) (non-Hispanic) | 35.9 | 35.7 | 55.4 |
| Robert Douthitt (non-Hispanic) | 40.4 | 20.4 | − 1.2 |
| Jim Hamilton (W) (non-Hispanic) | 48.5 | 75.9 | 42.9 |

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| John Anderson (non-Hispanic) | 33.6 | 7.1 | 9.7 |
| All non-Hispanic | 158.4 | 139.1 | 107 |
| Larry Osa (Hispanic) | 13.4 | 10.5 | 31.5 |
| Rollon | 171.8 | 149.6 | 138.3 |
| Percent not cast for this election (200% possible) | 28.2 | 50.4 | 61.7 |

W = won election
Table 3f, Ex. 53, p. 61.

Hispanics did not prefer Osa but Duggan and Hamilton, both of whom won. Blacks preferred Hamilton and Duggan. Anglos, on the other hand, preferred Hamilton and Douthitt. Ex. 53, Table 3f, p. 61. Thus, Hispanics elected both their preferences, while Anglos elected but one of theirs. Had only Anglo votes been counted, Duggan would have lost. She won because of strong Hispanic support and mild Black support. Douthitt lost because he received no Hispanic support. Anderson lost because he received no Black or Hispanic support. As an Hispanic ran, this was a racially contested election in which the Hispanic first (and second) preference won. There was no vote dilution in this election.

24. Plaintiffs contend that special circumstances were present in this election that warrant disregarding it. They contend that Larry Osa, although Hispanic, was not Mexican–American but Spanish–Basque. Larry Osa, however, is Hispanic, has a Spanish surname, speaks fluent Spanish, held himself out at all times as Hispanic including in this election and always has self-identified himself as Hispanic on the Census and for employment and other purposes. 9/27/94 Tr., Osa, pp. 140–143. When plaintiffs' counsel asked him to sign a declaration stating that he was not Hispanic, he refused. *Id.* at 147–148. Social scientists agree that self identification is the accepted method for determining a person's race or ethnicity, and is the method utilized by the Census. Other courts have not divided Hispanics into subgroups. *Garza v. County of Los Angeles,* 756 F.Supp. 1298, 1326–27 (C.D.Cal.1990). Plaintiffs did not subdivide Hispanics in their evidence. There is no evidentiary or legal basis to disregard this election. It represents an Hispanic success where Hispanic and Anglo preferences differed and voting was polarized, and in any event no vote dilution occurred.

*The 1990 Election*

25. In 1990, a special election was held to fill a vacancy created by the absence of Orchard Berryman from school board meetings. Four candidates filed to run, two Anglos, one Black and one Hispanic. Both Anglos (Randall Carson and Hannah Gonzalez, an Anglo married to an Hispanic) withdrew from the race, although their names remained on the ballot. The Black candidate Dianna Newton, had lived in El Centro most of her life, been the Municipal Courts Administrator, and was politically active. Her husband was a well-known city fire battalion chief, and she ran a vigorous campaign, spending over $5,000. Refugio Hernandez, the Hispanic candidate, had moved to El Centro only two years earlier, spent no money, ran virtually no campaign, put up no signs or did any advertising, and did not appear at a candidate's forum.

26. Newton, the Black candidate won the election handily, with 2,663 votes. Hernandez received but 753 votes.

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Randall Carson (non-Hispanic) | 21.8 | −8.8 | 19.0 |
| Dianne Newton (W) (African–American) | 46.6 | 89.8 | 17.5 |
| Hanna Gonzalez (non-Hispanic) | 1.9 | 2.0 | 5.2 |
| All non-Hispanic | 70.3 | 83.0 | 41.7 |
| Refugio Hernandez (Hispanic) | 5.5 | 10.3 | 27.3 |
| Rollon | 75.8 | 93.3 | 69 |
| Percent not cast for this election (100% possible) | 24.2 | 6.7 | 31 |

W = won election
Table 4f, Ex. 53, p. 69.

27. Newton was the preference of Black voters (90%) and Anglo voters (47%). While Hernandez received more Hispanic votes (27.3%) than the other candidates, more Hispanics "rolled off" or did not vote at all (31%) in this election than voted for Hernandez (27%). Ex. 53, Table 4f, p. 69. Thus, Hernandez cannot be regarded as a clear Hispanic preference, nor were Hispanics cohesive in their support of Hernandez. Hispanics, moreover, gave enough support to Newton (19%) that the combination of Black and Hispanic votes were sufficient to defeat Hernandez, even if no Anglo had voted. Ex. EM; 1/22/93 Tr., Dr. Burton, p. 179. Nor did Hernandez finish first in plaintiffs' *Thornburg* district. Ex. ES. With only one vote to cast and no opportunity therefore to bullet vote as in two or three seat elections, this particular election within the *Thornburg* district was comparable to the conditions that would have occurred if the election had been held on a district basis.

28. Plaintiffs' experts did not regard this election as an election at all, nor Hernandez as a viable or serious candidate. Plaintiffs' expert Dr. Burton agreed that there was no viable Anglo candidate, that Hernandez was a "nonserious" candidate, and that Newton was the "only serious candidate." He described the election as "barely an election" and agreed that "special circumstances" were present in this election. 1/21/93 Tr., Dr. Burton, pp. 134–138. Dr. Loewen agreed that it is not a fair test of racial bloc voting to use an election with a minority candidate who was not a viable candidate and then assert that whites are bloc voting against a minority candidate. He too agreed that special circumstances were present in this election. 2/2/93 Tr., Dr. Loewen, pp. 132–135. Thus, in this election, neither the second *Thorn-*

*burg* precondition (cohesion) was present, nor the third precondition, as there was no viable Hispanic candidate that could be regarded as a preferred candidate in any meaningful sense. Essentially, this was not a contested election, as Newton was the only serious candidate. There was no vote dilution in this election, which should be disregarded or given little weight under the totality of the circumstances.

## The 1991 Election

29. In the 1991 election, nine candidates ran for three Trustee seats. Three were Anglo (Kathy Arnold, Ronald Hull, Ronald Yates), one was Asian (Carl Whisler), one was Black (Dianna Newton) and four were Hispanic (Fernando Esperanza, Rae Perez, Larry Osa and Rose Mary Banks). Two Anglos and one Black won—Ron Hull, Kathy Arnold and Dianna Newton.

| Candidate | Vote for candidate as percent of turnout | | |
|---|---|---|---|
| | Among Non–Hispanics | Among Blacks | Among Hispanics |
| Kathy Arnold (W) (non-Hispanic) | 45.5 | 18.8 | 10.5 |
| Ronald Hull (W) (non-Hispanic) | 57.2 | − 0.6 | 19.5 |
| Carl Whisler (non-Hispanic) | 9.1 | 5.5 | 5.4 |
| Ronald Yates (non-Hispanic) | 9.1 | .5 | 11.2 |
| Dianne Newton (W) (African–American) | 26.2 | 101.3 | 23.7 |
| All non-Hispanic | 147.1 | 125.5 | 70.3 |
| Fernanda Esperanza (Hispanic) | 11 | 7.8 | 57.1 |
| Aurelia Perez (Hispanic) | 18.5 | 28.1 | 47 |
| Larry Osa (Hispanic) | 21.5 | 0 | 31.1 |
| Rose Mary Banks (Hispanic) | 16.8 | 27.4 | 24.4 |
| All Hispanic | 67.8 | 63.3 | 159.6 |
| Rollon | 214.9 | 188.8 | 229.9 |
| Percent not cast for this office (300% possible) | 85.1 | 111.2 | 70.1 |

W = won election
Table 5f, Ex. 53, p. 77.

Newton and Arnold were incumbents. Hull had been elected to the City Council twice and once had been mayor.

30. Hispanics preferred Esperanza, Perez and Osa, all of whom lost. Blacks preferred Newton, Perez and Banks. Anglos preferred Hull, Arnold and Newton, all of whom won. Ex. 53, Table 5f, p. 77. Newton defeated Perez, who finished fourth, by 160 votes.

31. Plaintiffs' multivariate analysis revealed that the Anglo bloc vote did not defeat Perez. Anglos preferred Newton third (26.2%), giving her 200 votes more than they gave to Perez. Hispanics gave 239 more votes to Perez (47%) than they gave to Newton (23.7%). Thus, if only Hispanic and Anglo votes were counted, Perez would have won by 39 votes and Newton would have lost:

|  | Anglo | Hispanic | Black |
|---|---|---|---|
| Newton | 681 | 243 | 275 |
| Perez | 481 | 482 | 76 |
|  | 200 | 239 | 199 |

Ex. EM; 1/22/93 Tr. Dr. Burton, pp. 180–181. Thus, *Anglo* bloc voting did not defeat Perez. She was defeated by strong Black bullet voting for Newton coupled with a lack of cohesion by Hispanic voters who split their votes among more Hispanic candidates (four) than there were seats up for election (three), and for Newton. This can be seen by how close the Hispanic votes were for these candidates.

| Candidate | Estimated Hispanic Votes |
|---|---|
| Esperanza | 586 |
| Perez | 482 |
| Osa | 319 |
| Banks | 250 |

Ex. EM. Dr. Burton conceded that Hispanics split their vote in 1991, and if they had not done so, effectively could have elected Esperanza or Perez, or possibly both. 1/22/93 Tr., Dr. Burton, pp. 147–153. This election is not an example of the third precondition or inability of Hispanics to elect at-large or vote dilution. It is an example of a lack of cohesion and special or totality of circumstances.

### The 1993 Election

32. In the November, 1993 election, there were six candidates for three seats—two Anglos (Cheryl Von Flue and Alan Luke), one Black (Sherman Rutledge) and three Hispanics (Efrain Silva, Frank Rodriguez and Jose Bustamante). Von Flue and Silva won:

| | |
|---|---|
| Von Flue (A) | 1,948 |
| Silva (H) | 1,536 |
| Luke (A) | 1,346 |
| Rodriguez (H) | 1,168 |
| Rutledge (B) | 738 |
| Bustamante (H) | 665 |

Silva defeated Anglo third place finisher Luke by 190 votes. Ex. EA, p. 1.

33. Group voting estimates for the 1993 election are problematic and illustrative of the range of error inherent in the estimates generated by the statistical techniques. Dr. Burton's multivariate ecological regression estimates for 1993 are as follow:

PERCENT OF VOTERS VOTING FOR CANDIDATE

| Candidate (Elected = *) | Among Whites | Among Blacks | Among Hispanics |
|---|---|---|---|
| Luke (W) | 49.7 | 21.2 | −13.7 |
| Von Flue* (W) | 48.0 | 0.4 | 39.6 |
| Rutledge (B) | 10.7 | 79.8 | 14.1 |
| Bustamante (H) | 9.1 | 13.9 | 26.9 |
| Rodriguez (H) | 25.1 | 14.2 | 32.6 |
| Silva* (H) | 22.9 | 5.7 | 63.3 |
| Totals | 165.5 | 135.2 | 162.8 |

Estimated ballots cast
(votes divided by voters [*100] )

| | | | |
|---|---|---|---|
| Total Possible | 200 | 200 | 200 |
| Turnout = | 2446 | 236 | 1219 |
| | | | (total = 3,901) |

34. Hispanics favored Silva and Von Flue, and Anglos preferred Luke and Von Flue, while Blacks preferred Rutledge. Ex. EA, p. 2. One of the estimates, however, is physically impossible, i.e., the –13% estimate of the percentage of Hispanics who cast a ballot for Anglo candidate Alan Luke. This physically impossible estimate means that the key assumption of ecological regression was violated. 9/16/94 Tr., Dr. Klein, p. 145. Because the total number of actual votes cast is fixed, the negative estimate for Luke necessarily means that ecological regression estimated too few votes for Luke and the estimates for other candidates are also wrong, i.e., too high. *Id.* at 153. Dr. Burton attempted to correct for this problem by setting the Hispanic estimate for Luke at 0 and reducing the estimates pro rata of all other candidates, a procedure he described as "norming." Below are his revised estimates

of the percent of each group's voters casting ballots for each candidate:

### PERCENT OF VOTERS VOTING FOR CANDIDATE

| Candidate (Elected = *) | Among Whites | Among Blacks | Among Hispanics |
|---|---|---|---|
| Luke (W) | 43.0 | 18.0 | 0.0 |
| Von Flue * (W) | 49.5 | 0.4 | 36.8 |
| Rutledge (B) | 11.0 | 82.0 | 13.0 |
| Bustamante (H) | 10.0 | 15.0 | 25.0 |
| Rodriguez (H) | 26.5 | 15.0 | 30.0 |
| Silva* (H) | 25.0 | 7.0 | 58.0 |
| Totals | 165.0 | 137.4 | 162.8 |

Estimated ballots cast (votes divided by voters [*100] )

| | Among Whites | Among Blacks | Among Hispanics |
|---|---|---|---|
| Total Possible | 200 | 200 | 200 |
| Turnout = | 2446 | 236 | 1219 (total = 3,901) |

| Candidate | Hispanic | Anglo | Black | Asian/ Other |
|---|---|---|---|---|
| J.R. Bustamante (H) | 24.6 | 11.9 | 16.0 | 22.8 |
| Cheryl K. Von Flue (A) | 25.1 | 53.7 | 27.2 | 40.0 |
| Frank Rodriguez (H) | 37.2 | 23.0 | 15.2 | 19.4 |
| Sherman Rutledge, Jr. (B) | 10.1 | 19.9 | 79.4 | 13.3 |
| Efrain Silva (H) | 56.5 | 25.5 | 24.8 | 39.9 |
| Alan D. Luke (A) | 7.8 | 39.4 | 4.2 | 26.0 |
| Total | 161.3 | 173.4 | 166.8 | 161.4 |
| N* of Cases | 697 | 682 | 61 | 65 |

Ex. EG, p. 1.

36. Dr. Brischetto's exit poll generated estimates at odds with Dr. Burton's multivariate analyses in several significant respects. Of greatest significance, the exit poll indicates that the Hispanic second preference is Rodriguez, not Von Flue:

| | Exit Poll | Ecological Regression |
|---|---|---|
| Rodriguez | 37 | 30 |
| Von Flue | 25 | 37 |

Other important differences are Hispanic support for Luke at 8% in the exit poll and – 13% (or 0) in ecological regression, Black support for Von Flue at 27% in the exit poll and 0 in ecological regression, and Black support for Silva at 25% in the exit poll and 7% in ecological regression. The exit poll, however, predicted that Black candidate Sherman Rutledge received 112 votes more than he actually did, which is obviously

Ex. EA, p. 3. However, defense expert Dr. Klein, testified that the norming procedure that Dr. Burton utilized was inappropriate, 9/16/94 Tr., Dr. Klein, pp. 145–155, 163–166; 9/20/94 Tr., Dr. Klein, pp. 37–38.

35. Plaintiffs also did an exit poll for this election, which produced the following estimates:

wrong. The exit poll also predicted 49 fewer votes for Luke than he received, 43 more votes for Bustamante than he received and 90 total votes more than actually cast overall. Ex. 143.

37. Dr. Brischetto testified in his deposition several months before trial that, where the exit poll and ecological regression differ, he did not know which was right. Yet at trial, after the defense presented its opposition case, Dr. Brischetto changed his opinion and testified that he believed that the multivariate estimates for Rutledge were more reliable than his exit poll estimate, but his exit poll estimates were more reliable than Dr. Burton's multivariate analyses for the Hispanic estimates for Von Flue, Rodriguez and Luke, and the Black estimate for Von Flue. Yet the actual votes cast for many candidates and overall is known and if the exit poll is wrong for Rutledge, other exit poll estimates for other candidates also have

to be wrong and the same is true if the multivariate estimates are wrong. 9/29/94 Tr., Dr. Brischetto, pp. 38–62. On the other hand, Dr. Brischetto testified that, using his exit poll to test whether the assumption of ecological regression was violated in Dr. Burton's 1993 ecological regression, he found little or no correlated error. 9/29/94 Tr., Dr. Brischetto, pp. 67–68; Ex. 138. Dr. Brischetto, in other words, both validated Dr. Burton's ecological regression and yet claimed many of its estimates were wrong. Dr. Brischetto conceded that either there was correlated error in Dr. Burton's 1993 multivariate regression analyses, or a –13% estimate can be created with little correlated error or the error was created by some other factor not known to him. 9/29/94 Tr., Dr. Brischetto, p. 88.

38. Neither the ecological regression nor the exit poll is necessarily more reliable. Both have advantages and disadvantages relative to the other. Exit polls are based on individual level data, not inferences about individuals from group precinct data as ecological regression is. On the other hand, exit polls are based on a sample and ecological regression is based on all voters except absentees. 9/24/94 Tr., Dr. Klein, pp. 48–51; 9/29/94 Tr., Dr. Brischetto, pp. 88–89.

39. Exit polls are particularly prone to high nonresponse rates which can seriously bias estimates and distort inferences, because people who do not respond may vote differently than those who do. 9/29/94 Tr., Dr. Brischetto, pp. 89–94, 107; 9/24/94 Tr., Dr. Klein, pp. 51. There were high nonresponse rates for Anglos (49%), Blacks (43%) and Asians (46%) in Dr. Brischetto's exit poll, much higher than Hispanics (27%). Another problem with exit polls is that people may lie. 9/29/94 Tr., Dr. Brischetto, p. 103; 9/20/94 Tr., Dr. Klein, pp. 49. Response rates may be affected by race or ethnicity of interviewers. In Dr. Brischetto's exit poll, 26 of 31 exit pollsters were Hispanic. Ex. DV.

40. Summarizing the results of these techniques, Silva was the Hispanic first preference in all analyses. Under bivariate analysis, the two Hispanic preferences were Silva and Rutledge. In the multivariate analysis, the two Hispanic preferences were Silva and Von Flue. In the exit poll, the two Hispanic preferences were Silva and Rodriguez.

41. Bivariate, multivariate and exit poll analyses all agree that Anglo and nonHispanic preferences were Von Flue and Luke, both Anglos. Silva was the fourth preference of Anglo voters among the six candidates. The Black preference was Rutledge.

42. Thus, Hispanics, according to multivariate analysis, elected both their preferences while Anglos elected but one of theirs. At worst, as reflected in the other two methods, Hispanics elected one of their preferences, as did Anglos. There was no vote dilution in this election, as Anglo bloc voting did not defeat the Hispanic first or perhaps even second preference.

43. Silva won despite Anglo bloc voting for Anglo candidates. As the fourth preference of Anglos and the fifth preference of Blacks, he would not have been elected if only Anglo and/or Black votes had been counted. Silva won even though he was the President of the local chapter of the Mexican–American Political Association (MAPA), and openly supported bilingual education, district elections and this lawsuit, which no doubt cost him some Anglo and/or Black support. Anglo bloc voting obviously was not sufficient to defeat Silva, the first preference of Hispanic voters.

44. Silva won despite three Hispanics vying for two seats and splitting the Hispanic vote among themselves. 9/20/94 Tr., Dr. Klein, pp. 63, 68, 70, 71; 10/12/94 Tr., Dr. Brischetto, pp. 88–90. Also, an unusual number of Hispanics (39%) bullet voted for Bustamante, Rodriguez or other candidates, even though there was no need for Hispanics to bullet vote, as there were as many Hispanics running as seats open. Silva's margin of victory was depressed due to these factors. Klein, id.

45. What changed in 1993 was Hispanic voting behavior. Hispanics did not spread their votes as much as they did in 1991. 36% of all Hispanic votes were cast for Silva, compared to 18% for Rodriguez and 15% for Bustamante. Ex. EA, p. 5. In 1991, 25% of all Hispanic votes were cast for Esperanza, 20% for Perez, 14% for Osa, and 11% for

Banks. Ex. 53, p. 78. The Hispanic vote was therefore much more concentrated behind Silva in 1993 than for Esperanza in 1991. There were more Hispanics voting who were more cohesive in favor of Silva and supported him by a wider margin over their next preference than was true in 1991:

| 1991 | | 1993 | |
|------|-----|-----------|-----|
| Esperanza | 586 | Silva | 707 |
| Perez | 482 | Von Flue | 449 |
| Osa | 319 | Rodriguez | 336 |

46. Silva also was helped by an increase in the number and percentage of Hispanics among the total population, voting age citizens, registrants and voters in El Centro. By 1990, Hispanics had grown to 65% of the total population, and 59% of the voting age population (Exs. EU, EW). Also, 4,811 of the 12,451 Hispanics over the age of 18 were noncitizens. Ex. EX. Thus, in 1990 Hispanics and Anglos both were 46% of all voting age citizens in the City of El Centro. Ex. EU. For the elementary district, Hispanics were 47% of all voting age citizens, Anglos 44%. 9/21/94 Tr., Dr. Morrison, p. 99; Exs. EV, EW, EX. Since 1990, the Hispanic proportion of El Centro's voting age citizens has increased. 9/21/94 Tr., Dr. Morrison, p. 107; Dr. Estrada, Ex. EY, p. 8. Hispanics under the age of 18 are mostly citizens. Thus, while Hispanics are 65% of the total population of El Centro, they are 76% of all people in El Centro under the age of 18. 9/21/94 Tr., Morrison, pp. 106–107. Each year since 1990, as Hispanics aged 14 to 17 aged into maturity, the Hispanic percentage of all voting age citizens rose and will continue to rise. Also, 4,000 Hispanic noncitizens applied to legalize their status under the Immigration Reform and Control Act ("IRCA"), some of whom have become naturalized citizens and many others soon will. 9/21/94 Tr., Morrison, pp. 107–108. This increase in Hispanic voting age citizens in El Centro also is reflected in registration increases. 9/21/94 Tr., Dr. Morrison, p. 109; Dr. Estrada, Ex. EY, p. 8. Plaintiffs' demographer Dr. Estrada concurred with everything Dr. Morrison said regarding Hispanic age structure, naturalization, registration and the fact that the Hispanic share of voting age citizens is higher in 1994 than in 1990. 9/21/94 Tr., Dr. Morrison, pp. 109–111, 123–124; Dr. Estrada, Ex. EY.

47. In 1985, there were 2,776 Hispanic registrants out of 10,312, or 27% of the total. Ex. ET. By 1993, there were 4,928 Hispanic registrants out of 12,018, or 41% of the total. NonHispanic registrants declined in absolute numbers from 7,536 in 1985 to 7,090 in 1993. These increases in Hispanic registration continued in 1994, as Hispanics were 42.6% of all registrants by the June primary:

### HISPANIC AND NONHISPANIC REGISTRATION AND TURNOUT IN THE EL CENTRO SCHOOL DISTRICT SINCE 1985

| MEASURE | 1985 | 1987 | 1989 | 1990 | 1991 | 1993 | 1994P |
|---------|------|------|------|------|------|------|-------|
| **REGISTRATION** | | | | | | | |
| No. of registrants | 10,312 | 10,596 | 11,565 | 11,565 | 11,346 | 12,018 | 11,858 |
| Hispanic | 2,776 | 3,227 | 3,822 | 3,822 | 3,982 | 4,928 | 5,046 |
| Non–Hispanic | 7,536 | 7,369 | 7,743 | 7,743 | 7,364 | 7,090 | 6,812 |
| Percent Hispanic | 26.9% | 30.5% | 33.0% | 33.0% | 35.1% | 41.0% | 42.6% |
| **VOTER TURNOUT** (includes absentees in 1994): | | | | | | | |
| Total turning out | 3,118 | 3,280 | 3,347 | 5,643 | 3,768 | 3,941 | 4,944 |
| Spanish surnamed | 571 | 708 | 754 | 1,506 | 1,012 | 1,226 | 1,568 |
| Non–Spanish surnamed | 2,547 | 2,572 | 2,593 | 4,137 | 2,756 | 2,715 | 3,376 |
| Percent Spanish surnamed | 18.3% | 21.6% | 22.5% | 26.7% | 26.9% | 31.1% | 31.7% |

NOTES: Implied Hispanic ethnicity derived as 1.059 × no. of Spanish-surnamed registrants. Plaintiffs show identical numbers of registrants in 1989 and 1990.

SOURCES: 1985 through 1991: Plaintiffs' "ELCT85.PRN," and subsequent files, Bonilla 4/23/92 Declaration, Ex. C; 1993 and 1994: Imperial County Elections Dept. official voter files.

---

Dr. Rabinovitz expects Hispanic registration to continue to "rise and rise rapidly." 9/22/94 Tr., Dr. Rabinovitz, p. 39.

48. Turnout also has increased. There were only 571 Spanish surnamed voters in 1985 out of 3,118 total voters, or 18.3% of the total. By 1993, there were 1,226 Spanish surnamed voters out of 3,941, or 31.1% of all voters. That percentage rose to 31.7% by the June, 1994 primary. Ex. ET.

49. Defense demographic expert Dr. Morrison testified that it is his opinion that Hispanics are a majority of the voting age citizens in the El Centro Elementary School District *now* and that the Hispanic proportion of all voting age citizens will continue to increase, as young Hispanics continue to age into maturity and IRCA applicants naturalize soon. 9/21/94 Tr., Morrison, p. 111. The Court accepts this unrebutted testimony as a valid, legitimate, reasonable inference from the demographic evidence. Additionally, this dynamic demographic change that has occurred in El Centro since 1985 means that elections ten years ago in 1985 are not an accurate measure of the ability of Hispanics to elect at-large *today* or the ability of white bloc voting usually to defeat Hispanic preferred candidates *today*.

50. Exhibit 144 estimates what would happen if the 1993 candidates received the same level of support as they did in 1993 but applying those support rates to the number of Hispanic and non Hispanic voters in the voter base for each election from 1985 to 1991. Silva would lose in 1985 by 91 votes and in 1987 by 24 votes, but wins by 1 vote in 1989 and in each election thereafter by wider and wider margins, paralleling the growth of the Hispanic electorate.

51. Exhibits 145 and FT estimate who would have won in 1985–91 elections if the 1993 voter turnout base was used. The 190 vote difference between Perez and Berryman in 1987 disappears, and Anglo bloc voting is no longer sufficient to defeat Perez in that election. 10/12/94 Tr., Dr. Brischetto, pp. 64–69, 74.

52. There is no longer any advantage to district elections for Hispanics, as they have as much if not greater likelihood of electing at-large as by district. 9/22/94 Tr., Dr. Rabinovitz, p. 25. Dr. Rabinovitz, one of defendant's experts, testified that El Centro employs the type of at-large election system most advantageous to minorities among the three most commonly used at-large election systems [4]—pure at-large (El Centro), at-large with a residency subdistrict, and at-large with posts or places. Ex. FK. Pure at-large systems with staggered term, plurality win features that permit bullet voting, which El Centro uses, have proven in research to elect minorities significantly more frequently than other at-large systems. 9/22/94 Tr., Dr. Rabinovitz, pp. 12–24, 27; 107–109. The other types of at-large election systems create head to head contests where only one candidate can win and where bullet voting is not possible. *Id.* The same is true of district election systems where voters get but one vote in each district, there is no bullet voting and the most votes wins. *Id.,* esp. 107–109. Indeed, under a district election system, if one Anglo and one Hispanic ran for one seat, and nonHispanics preferred

---

4. Another type of at-large election system is cumulative voting, which permits a voter to cast more than one ballot for the same candidate. This type of at-large system is rarely used in this country (9/22/94 Tr., Dr. Rabinovitz, p. 57) and is not legally authorized by the California Legislature as a method of electing School Board trustees. Cal.Educ.Code §§ 5018–5020, 35012. Neither party presented any data, research or other statistical evidence on cumulative voting.

the Anglo at the same level as Hispanics, supported the Hispanic candidate, a majority would be needed to prevail. In El Centro's type of at-large election system, a minority can win by being second or third in a two or three seat election without being a majority of the voters or getting the most votes. *Id.* at 15, 27, 48. Staggering is advantageous because it enables a minority group to win one seat every two years, which the steady increase in Hispanic citizenship and registration makes "very likely." *Id.* at 19, 42.

53. Plaintiffs' expert Dr. Brischetto has done research indicating that, when the minority population exceeds 50% of the total population, at-large systems elect minorities more frequently than district election systems. In his research, at-large cities over 50% minority achieved near proportionality in minority representation on governing bodies, while cities that changed to district or mixed district and at-large election systems did not. The same was true if Hispanics were considered separately from other minorities. Dr. Brischetto testified that at-large systems are more dilutive in Anglo majority cities. 10/12/94 Tr., Dr. Brischetto, pp. 93–108; Exs. FL, FM, FN. El Centro was only 28% Anglo in 1990, a figure which has declined since then.

54. Plaintiffs have the ability to elect at-large, with as much or more ability than would exist with districts, as demonstrated by Silva's victory, rising voting age citizen and registration levels, and by the fact that Hispanics have been elected frequently to the City Council and the High School District Board. 9/20/94 Tr., Dr. Klein, pp. 102–103; 9/22/94 Tr., Dr. Rabinovitz, p. 25, 49, 59. Hispanic successes in City Council and High School District elections mean that the more mixed record in Elementary District elections is not a structural issue but has to do with differences among the candidates and the quality of their campaigns. 9/22/94 Tr., Dr. Rabinovitz, pp. 31–32; 9/21/94 Tr., Dr. Klein, pp. 56–57. Silva, for example, "campaigned hardest" in 1993, was the "best qualified," ran a "very thorough campaign" and "got out there and did the work." Fernando

Esperanza was not surprised Silva won. 9/21/94 Tr., Taylor, pp. 140–141; 9/27/94 Tr., Von Flue, pp. 158–159; 10/13/94 Tr., Esperanza, pp. 28, 57. Also, there are racial issues affecting the City as well as the school district. 2/4/93 Tr., McFadden, pp. 21–23. Thus, Dr. Rabinovitz does not believe that it is appropriate to ignore "exogenous" elections. 9/22/94 Tr., Dr. Rabinovitz, pp. 30–31. Dr. Burton and Dr. Loewen have utilized exogenous elections in other cases in which they have testified, Dr. Burton examined other elections in this case (Exs. 60; ED) and Dr. Loewen testified that he regards exogenous elections as relevant evidence. 1/22/93 Tr., Dr. Burton, pp. 109–110; 2/3/93 Tr., Dr. Loewen, pp. 104–112. Significantly, Dr. Loewen testified that this was only the second case of many he has examined where exogenous election results differed from the results in the jurisdiction under challenge, that Hispanic success in exogenous election decreases the assertion that Anglos are unwilling to vote for Hispanics, and is evidence against any thesis that the at-large system has a "chilling effect" on Hispanic efforts to elect. 2/3/93 Tr., Dr. Loewen, pp. 108, 112, 111.

### Special Circumstances in 1993

55. Plaintiffs contend that the November, 1993 election should be disregarded because of the special circumstances of this pending litigation. They claim that Anglo voters knew that, if they voted for and elected an Hispanic, this lawsuit might be dismissed. They claim that Anglo voters in fact did so, and that Silva's victory was a fluke or an aberration. The evidence does not support this contention.

56. Silva was not an Anglo preference. He finished fourth out of six candidates among Anglo voters. Anglos preferred two Anglos, Von Flue and Luke. Silva would not have been elected if only Anglo votes were counted. He won despite Anglo bloc voting for Anglo candidates in an election Dr. Brischetto characterized as "clearly polarized." 9/29/94 Tr., Brischetto, p. 13. Thus, there is no obvious indication of changed Anglo vot-

ing behavior such as Anglos making Silva their preference or even unusual Anglo support for Silva.

57. Only 22–25% of Anglo voters cast a ballot for Silva, depending on methodology. This Anglo support level for an Hispanic candidate is not unusual in El Centro elections for Elementary School District, City Council, or High School District elections, and less than the Hispanic support level for Von Flue in this election (37%). 9/20/94. Tr., Dr. Klein, pp. 73, 75–77, 96; Ex. EJ. Indeed, these same Anglo voters gave greater support to the two Hispanic candidates in the City Council race the same day, 35% for Perez and 34% for Dhillon, even in the absence of a lawsuit. *Id.* at 73; 9/22/94 Tr. Dr. Rabinovitz, p. 57; Ex. ED. Anglo support rates for Hispanic candidates in past elections are as follows:

ANGLO SUPPORT RATES FOR HISPANIC CANDIDATES

| Hispanic Candidate Name | Date of Election | Jurisdiction | Anglo Support Rate |
|---|---|---|---|
| Gonzalez | 1987 | City Council | 61.8 |
| Beltran | 1984 | City Council | 58.9 |
| Dhillon | 1985 | City Council | 53.7 |
| Terrazas | 1991 | City Council | 50.5 |
| Villanueva | 1992 | High School | 43.0 |
| Perez, G. | 1993 | City Council | 34.8 |
| Dhillon | 1993 | City Council | 34.2 |
| Aragon | 1988 | High School | 30.9 |
| Perez, A. | 1987 | Elem. School | 28.6 |
| Rodriguez, F. | 1993 | Elem. School | 26.5 |
| Silva | 1993 | Elem. School | 25.0 |
| Montiel | 1985 | Elem. School | 23.4 |
| Osa | 1991 | Elem. School | 21.5 |
| Perez, A. | 1991 | Elem. School | 18.5 |
| Banks | 1991 | Elem. School | 16.8 |
| Osa | 1989 | Elem. School | 13.4 |
| Gonzalez | 1985 | City Council | 13.1 |
| Esperanza | 1991 | Elem. School | 11.0 |
| Bustamante | 1993 | Elem. School | 10.0 |
| Sesma | 1993 | City Council | 9.7 |
| Garcia | 1987 | City Council | 6.2 |
| Hernandez | 1990 | Elem. School | 5.5 |
| Rodriguez | 1985 | City Council | 4.9 |
| Alva | 1990 | High School | 3.4 |
| Marquez | 1991 | City Council | 1.9 |
| Beltran | 1985 | City Council | −0.2 |

Ex. EJ.

58. Plaintiffs, however, contend that Anglos gave less support to Anglo candidates making it possible for an Hispanic to win. Yet in 1991, Anglos cast 52% of all their votes for Anglo candidates, and 48% for minority candidates. Ex. 53, p. 78. In 1993, Anglos cast 56% of their votes for Anglo candidates and 44% for minority candidates. In other words, Anglo support for Anglo candidates increased in 1993 over 1991. 9/20/94 Tr., Dr. Klein, pp. 79–80. Anglo support for Hispanic candidates in 1993 also increased:

ANGLO VOTING BEHAVIOR IN 1991

AND 1993 ELEMENTARY SCHOOL BOARD ELECTIONS

| Election Year | Anglo Candidates | Hispanic Candidates |
|---|---|---|
| 1991 | 52.0 | 31.5 |
| 1993 | 56.1 | 37.3 |
| Difference | 4.1 | 5.8 |
| Net Difference | | 1.7 |

The net increase in Anglo support is 1.7%, which all experts agreed was statistically insignificant, given the margin of error in the estimates, and which Dr. Klein indicated would disappear altogether if proper norming procedures are utilized. 9/20/94 Tr., Dr. Klein, pp. 87–89; Ex. EK. Additionally, Hispanic support for Anglo candidates increased from 18% in 1991 to 22.7% in 1993. This 4.7% increase nearly offsets the 5.8% increase in Anglo support for Hispanic candidates, leaving a statistically insignificant 1.1% difference that also disappears with proper norming.

59. The reason why there were offsetting increases in Anglo support for both Anglo and Hispanic candidates in 1993 is a change in the composition of the candidates from 1991. There was an Asian (Whisler) and a strong Black candidate in 1991 (Newton). There was no Asian and a weak Black candidate (Rutledge) in 1993. As a result, Anglo votes for Black and Asian candidates were redistributed to both Anglo and Hispanic candidates:

% ANGLO SUPPORT

| CANDIDATE GROUP | BURTON 1993 ECOL. REGR. | BURTON 1991 ECOL. REGR. |
|---|---|---|
| ANGLO CANDIDATES | 56.1 | 52.0 |
| NON–ANGLO CANDIDATES | 43.9 | 48.0 |
| BLACK & ASIAN CANDIDATES | 6.6 | 16.5 |
| HISPANIC CANDIDATES | 37.3 | 31.5 |

60. Perhaps the best evidence that Anglos did not change their voting behavior to win the lawsuit in the 1993 ECESD election is the outcome of the 1993 City Council election that took place on the same day. 9/20/94 Tr., Dr. Klein, pp. 73, 92–94. Dr. Brischetto's exit poll of the same voters indicates that Anglos gave more support to Anglo candidates in the School District and less support to Hispanic candidates than in the City Council race. 72% of Anglos cast one or more ballots for Anglo candidates in the City Council race, while 78% cast one or more ballots for Anglo candidates in the School Board race. Ex. FI. Also, Anglos gave less support to their second preference in the City Council race (Makin) than they gave to Luke. 9/20/94 Tr., Dr. Klein, pp. 93–95; Ex. ED. Thus, these same Anglo voters were more united in their support of Anglo candidates in the School Board race than in the City Council race, even though no lawsuit

was pending against the City. 9/24/94 Tr., Dr. Brischetto, pp. 16–22. Luke, moreover, did not lose because he lacked Anglo support. He received nearly as much support (43%) as Von Flue (49%), who won by a considerable margin. According to Dr. Burton's multivariate analysis, Von Flue received 1,211 Anglo votes, Luke 1,052. Luke lost because he received virtually no minority support. Ex. FJ. Substantial Anglo support alone was not sufficient to prevail.

61. Plaintiffs argue that Anglo support for nonHispanic candidates declined 5.6%, while Anglo support for Hispanic candidates increased by 5.8%, for a net difference of 11.4%:

| 1991 | | |
|---|---|---|
| Anglo Support | | Anglo Support |
| 52 % | Anglo | 31.5% Hispanic |
| 4.2 % | Whisler (Asian) | |
| 12.2 % | Newton (Black) | |
| 68.4 % | Non–Hispanic | |

| 1993 | | |
|---|---|---|
| Anglo Support | | Anglo Support |
| 56.1 % | Anglo | 37.3% Hispanic |
| 6.7 % | Rutledge (Black) | |
| 62.8 % | Non–Hispanic | |
| −5.6 % | | +5.8% |

11.4% Net Difference

Ex. 128. As noted above, however, lower Anglo support for all nonHispanic candidates is due to a change in the composition of the candidates and actually masks increased support for Anglo candidates. Less Anglo support for Black and Asian candidates in 1993 helped Anglo candidates nearly as much as it helped Hispanic candidates (a net 1.7% difference, which is statistically insignificant), and the increased Anglo support for Hispanic candidates did not necessarily go to Silva, as Anglos preferred Rodriguez to Silva. Also, plaintiffs' Exhibit 128 includes Anglo non-preferences, Black and Asian candidates as well as Anglo candidates and ignores offsetting increases in Hispanic support for Anglo candidates and the fact that Hispanics preferred Von Flue to two other Hispanic candidates and at a level (37%) exceeding Anglo support of Silva. A better comparison is Ex. EN which reflects the percentage of all votes

cast by Anglo and Hispanic voters for their preferred candidates in 1991 and 1993:

PERCENTAGE OF TOTAL VOTES CAST BY A GROUP FOR ITS PREFERRED CANDIDATES FOR THE SEATS AT STAKE

| Election | White Voters | Hispanic Voters |
|---|---|---|
| 1991 | 60 | 59 |
| 1993 | 56 | 58 |
| Difference | 4 | 1 |

Dr. Klein testified that this 3% difference is statistically insignificant and would disappear entirely if his alternate norming procedure were utilized. 9/20/94 Tr., Dr. Klein, p. 92.

62. Another problem with Ex. 128 is that it is based on Dr. Burton's normed multivariate regression analysis which Dr. Brischetto states contains five erroneous estimates, and is derived from an analysis that contained a physically impossible—13% estimate of Hispanic support for Luke that Dr. Klein testified was normed improperly. The exit poll data is no more reliable, as Dr. Brischetto's exit poll predicted 112 more votes for Rutledge than he actually received, 90 more than actually cast and contained high nonresponse rates. In the City Council election Dr. Brischetto's exit poll predicted Perez finished second and won, even though he actually lost. Ex. FU. The statistical evidence is not precise enough to prove any change in Anglo voting behavior, particularly given the deficiencies, mistakes and differences among the techniques. The Court is also skeptical of comparing election years with different candidates. Any difference, further, would not necessarily be due to Anglos voting for Silva to end the lawsuit.

63. Plaintiffs presented no evidence of unusual, organized Anglo financial support or endorsement of Silva or other Hispanic candidates, nor did Anglos campaign to elect an Hispanic nor was Silva the handpicked candidate of the Anglo power structure. Neither incumbent Trustees nor District officials, employees or agents endorsed, gave any money or assisted in the campaigns of any of the Hispanic candidates. 9/21/94 Tr., Taylor, pp. 141, 145–147; 9/27/94 Tr., Newton, pp. 12–14. There was no testimony or evidence that any Anglo voter voted for Silva to win the lawsuit. Fernando Esperanza, who testified for plaintiffs, testified that he never even consid-

ered voting for an Anglo in order to help plaintiffs win the lawsuit. 10/13/94 Tr., Esperanza, pp. 56–57.

64. Dr. Francine Rabinovitz, a political scientist at the University of Southern California, testified that voting for an Hispanic that Anglos otherwise would not support, just to win the lawsuit, involves a more complicated chain of reasoning than political scientists know to be true of most voters when they go to the polls—Anglos, many of whom, have no children in the elementary schools, would have to be aware of the lawsuit, understand it, and care about the outcome, be aware that an Hispanic success might enable the District to win the lawsuit, understand that the result if plaintiffs won the lawsuit would be district elections and believe that they somehow would be disadvantaged by district elections. Dr. Rabinovitz believes that the likelihood this occurred is very small. 9/22/94 Tr., Dr. Rabinovitz, pp. 51–56. Plaintiffs did not controvert this testimony. Indeed, Dr. Rabinovitz believed that Anglos would vote their normal self-interest even more strongly. *Id.* at 54–55. Dr. Klein, moreover, believed that Hispanics had the same incentive to "throw" the election as Anglos. Indeed, consistent with that hypothesis, Hispanics preferred Von Flue over Rodriguez and Bustamante, and gave her more support (37%) than Anglos gave Silva (25%). Dr. Klein, however, did not believe any evidence exists that either Anglos or Hispanics changed the way they voted because of the lawsuit. 9/20/94 Tr., Dr. Klein, p. 96.

65. This trial initially began in January 1993 but on February 9, 1993 was continued following El Centro's Rule 52(c) motion for judgment when plaintiffs rested their case, eventually resuming September 14, 1994, because the Court wanted the benefit of another election before ruling on the case. Rising Hispanic population, registration and turnout, coupled with recent successes in City Council and High School District elections caused the Court to suspect that Hispanics already had the ability to elect at-large. On February 10, the Court's ruling was reported in the local newspaper, the *Imperial Valley Press,* along with a statement by plaintiffs' witness Francis Beope that the Court had

denied ECESD's motion, which ECESD believed was untrue. Ex. FC; 9/21/94 Tr., Taylor, pp. 142–143.

66. The School Board then issued a press release on the lawsuit, stating its interpretation of the Court's action and disagreeing with Ms. Beope. The press release quoted School District legal counsel Frank Oswalt as follows:

It was clear to me that Judge Brewster will dismiss this case if there is Hispanic electoral success in next November's election.

On February 11, 1993, the *Imperial Valley Press* reported Mr. Oswalt's statement. Ex. CY. Dr. Rabinovitz did not believe that voters were likely to remember Oswalt's statement eight months later at the time of the November election. 9/22/94 Tr., Dr. Rabinovitz, p. 50. Dr. Rabinovitz testified that: (1) fewer people read newspapers than watch TV, (2) people forget what they read, (3) politicians concentrate their advertising just before an election because people don't focus on elections until then, and (4) the chain of reasoning to connect Oswalt's statement in February to electoral behavior in November is too complicated to reflect what political scientists know to be typical of how voters behave on election day. 9/22/94 Tr., Dr. Rabinovitz, pp. 49–52, 54–56. None of the incumbent Trustees nor the District's legal counsel ever discussed the lawsuit in public after Oswalt's statement. This was the only statement ever made by anyone in El Centro that the Court "will" dismiss the case, as opposed to "may." Subsequent news stories all used the word "may."

67. The candidate filing deadline for the November, 1993 election was August 6. Only two candidates filed—Von Flue and Rutledge, none of whom were Hispanic. A newspaper article reported that the absence of Hispanic candidates might "stymie" the Court's objective to evaluate the impact of demographic change on the ability of Hispanics to elect at-large. Ex. 85–2. Thus, Hispanics arguably knew that by not running a candidate or by not voting for Hispanic candidates, their position in the lawsuit perhaps would be enhanced. Because no incumbents filed to run, the candidate filing deadline was

extended to August 11. Four more candidates filed by the extended deadline, three of them Hispanic, indicating that publicity and the lawsuit had little effect on the November election.

68. Plaintiffs claim that publicity about the costs of the lawsuit and possible teacher layoffs and program cuts might have caused El Centro teachers who are predominantly Anglo to support Hispanic candidates. Yet no teachers were laid off in 1993 or 1994, and El Centro teachers knew there would be no layoffs by May of 1993, well before the election. The layoff notices given in March of 1993 were required by state law for following year layoffs, and were precautionary only because the District does not finalize its budget nor know how much state revenue it will receive until June each year. 9/21/94 Tr., Taylor, pp. 134–136. Al Dempsey, the President of the union, the El Centro Elementary Teachers' Association ("ECETA"), testified that the union understood that the notices were precautionary and did not take them seriously, telling members receiving the notices not to worry. 9/21/94 Tr., Dempsey, p. 189. Exhibit FD, a May 5, 1993 newspaper article, announced that the notice deadline for teacher layoffs had passed without any layoffs occurring.

69. Another special circumstance alleged by plaintiffs is that ECETA, which is predominantly Anglo, did not endorse any candidates in the 1993 election. The reason that there was no endorsement is that ECETA, like other California Teachers Association ("CTA") affiliate unions in the state, were diverting their energies to defeating the school voucher initiative that was on the November, 1993 ballot. 9/21/94 Tr., Dempsey, p. 182; 9/27/94 Tr., Waters, p. 128. Why the lack of an endorsement in the School Trustee election voting rights is of any voting rights consequence is unclear. Apparently, plaintiffs believe that the lack of an ECETA endorsement of Anglo candidates meant less Anglo support than in past elections because ECETA members are predominantly Anglo. Yet there is no reason to believe that ECETA would not have endorsed Silva—in fact, ECETA President Al Dempsey voted for Silva, and was surprised that an Hispanic

was not recommended by the ECETA Political Action Committee. 9/21/94 Tr., Dempsey, p. 199. The first candidate ECETA ever endorsed was an Hispanic, Raul Aragon in 1975. ECETA frequently supported Hispanic and Black candidates in past elections— Perez and Berryman, in 1987, Newton in 1990, and Newton and Perez in 1991. Nor do ECETA candidates necessarily win if they are endorsed. Thus, it would not have been unusual if ECETA had endorsed and supported Silva, nor would it have been unusual or disabling if ECETA had endorsed Anglo candidates. Additionally, Dempsey testified that it would be "stupid" for members to vote for someone just to end the lawsuit, as the union would have to deal with the new Trustee on many other issues for the next four years. 9/21/94 Tr., Dempsey, p. 188. He personally did not prefer Luke because Luke spoke of fiscal controls which generally means that he would be unfavorable to teacher salary demands, Von Flue because she was "management" in her current job, and Rutledge and Bustamante because they were not serious candidates. He thought Silva and Rodriguez would be more sympathetic on teacher salary issues.

70. Still another special circumstance alleged by plaintiffs is the lack of incumbents in the November, 1993 election. Anglo incumbents Lucille Duggan and Jim Hamilton did not run for reelection. Plaintiffs contend that this made it easier for an Hispanic to win. Yet other elections have included open seats—1990 (one seat) and 1991 (one seat). The lack of an incumbent, moreover, provides a truer test of the relative voting strength of Hispanics, Anglos and Blacks, without the special advantage of incumbency. 9/22/94 Tr., Dr. Rabinovitz, pp. 56–57. Nor was there any evidence that Duggan or Hamilton were urged or pressured not to run to make it easier for an Hispanic to get elected. Hamilton had served two terms, and Duggan was 70 years old. Taylor, pp. 148–149. Both had advised people that they would not run for reelection in November, 1993 before this Court's February 9, 1993 ruling. 9/27/94 Tr., Newton, p. 15.

71. On the basis of the totality of the evidence, there are no special circumstances

that warrant disregarding the Hispanic electoral success in the 1993 election. Not one witness expressed the opinion that any votes were switched because of the lawsuit. The Court does not believe that the newspaper article or the lawsuit affected the outcome of the election, nor did the objective or statistical evidence prove that. The 1993 election, together with recent Hispanic successes in City Council and High School District elections and rapidly increasing Hispanic population, registration and turnout, convince the Court that Hispanics are able to elect at-large currently and that white bloc voting does not usually defeat Hispanic preferred candidates at the present time.

### Summary of Elections

72. To summarize the elections above, there was no vote dilution in any of the elections analyzed:

1993—3d *Thornburg* precondition not present; Hispanic candidate wins.

1991—2d and 3d *Thornburg* preconditions not present (Anglo bloc voting not sufficient to defeat Hispanic candidate who lost due to lack of cohesion); also disregard under totality of circumstances because of Hispanic vote splitting.

1990—2d and 3d *Thornburg* preconditions not present (lack of cohesion); also disregard under totality of circumstances (nonviable candidate, not racially contested).

1989—3d *Thornburg* precondition not present (Hispanic preferences win).

1987—1st *Thornburg* precondition not present.

1985—1st *Thornburg* precondition not present.

The Court regards the more recent elections as more probative in view of the significant increase in Hispanic population, voting age citizenship and political participation since 1985, which along with Silva's success and other Hispanic successes in City Council and high school district elections leads the Court to conclude that Hispanics have the ability to elect at-large currently.

73. Plaintiffs, finally, contend that Anglos and Blacks should be combined into a single unified nonHispanic "bloc" for purposes of examining racially polarized or "White" bloc voting. Factually, however, Anglos and Blacks are not politically cohesive and do not form a unified voting bloc. The first preference of Black voters, when confronted with a choice between a Black candidate and an Anglo or Hispanic candidate is invariably a Black candidate. In fact, Black voters are more cohesive in support of Black candidates than Anglos are for Anglo candidates or Hispanics for Hispanic candidates. If no Black candidate is available, Black voters do not routinely favor Hispanic or Anglo candidates. Anglos generally support Anglos, and if no Anglo candidate is available, do not routinely favor Hispanic or Black candidates. 9/22/94 Tr., Dr. Rabinovitz, pp. 57–59. Anglo and Black voting patterns from 1985–1993 are as follows:

1985—Black second preference was Montiel, whom Anglos did not support.

1987—Black second preference was Perez whom Anglos did not support. Anglos third preference was Berryman who was Black first preference.

1989—Anglos supported Hamilton and Anderson; Blacks and Hispanics both supported Hamilton and Duggan.

1990—Anglos supported Dianna Newton, the Black preference.

1991—Black first preference was Newton who was Black, and the second and third preferences were Perez and Banks, both of whom are Hispanic; none of the Black preferences were Anglos; Anglo third preference was Newton.

1993—Black first preference was Rutledge who was not supported by Anglos; Anglos also did not support Rutledge in the 1992 High School District race.

Thus, Blacks would have elected five Hispanic preferences whom Anglos did not support. Additionally, Anglos favored Hispanic candidates over Black candidates in the 1992 High School District election (Villanueva over Rutledge) and in the 1991 City Council election (Terrazas over Sanders). Ex. EI. Both Orchard Berryman and Dianna Newton held prominent positions in the community before they were elected to the school board. 2/4/93 Tr., McFadden, pp. 7–10; 9/27/94 Tr., New-

ton, pp. 4–6, 15–17; 9/27/94 Tr., McGee, pp. 108–110. Hispanics, Blacks and Anglos each constitute distinct voting blocs and vote cohesively for candidates from their own group, as their first preferences. Anglos and Blacks are not a single bloc that votes cohesively. Indeed, the fact that Blacks and Anglos were voting differently is what caused Dr. Burton to shift from bivariate to multivariate analysis. 1/22/93 Tr., Dr. Burton, p. 22; 2/2/93 Tr., Dr. Loewen, pp. 183–187. Dr. Rabinovitz also did not believe it was appropriate to put Blacks and Anglos together. 9/22/94 Tr., Dr. Rabinovitz, pp. 30–31. Indeed, Blacks have been the victims of Anglo discrimination in El Centro and the Imperial Valley. 9/27/94 Tr., McGee, pp. 106–107, 110–113; 9/27/94 Tr., Newton, p. 2. Most voting rights cases involve Anglo bloc voting against Black candidates.

### Senate Factors

74. *History of Official Discrimination Touching the Right to Vote.* Plaintiff historian Dr. Romo testified about voting related discrimination mostly in California and in Imperial Valley. Virtually all plaintiffs' voting discrimination evidence was pre–1970. The original 1849 California Constitution allowed only white male citizens of the United States and white male citizens of Mexico to vote. The Literacy Act, which required a person to be able to read the Constitution in order to vote, was enacted in 1893 and overturned in 1970 by the California Supreme Court. This law was enforced in Imperial County in the late 1950's and early 1960's in partisan elections. There also was a law enacted in 1941 that required only English to be spoken in polling places that was not removed until 1973.

75. El Centro did not deny that there was official discrimination touching the right to vote in the distant past, but challenged plaintiffs' claim that past discrimination affects Hispanic voters presently. Dr. Romo did not address the recent "substantial jump" in Hispanic population in the last 20 years, much of which is the result of recent immigration from Mexico. 2/4/93 Tr., Dr. Romo, pp. 73, 4, 75. These recent arrivals hardly can claim to be affected by official discrimination in this country a century ago or before

1970. El Centro and Imperial County are now 65% Hispanic, more than any county in California.

76. Dr. Romo also did not address the numerous laws enacted by the California Legislature in the last 30 years to improve minority voting participation and to liberalize the political process. 2/4/93 Tr., Dr. Romo, pp. 104–109. These laws included: County clerks could not refuse to deputize registrars because of race (1961); prohibition of election day challenges based on literacy (1961); requirement that a copy of the election ballot in Spanish be posted in each polling place where the language minority population was greater than 3% (1971); law allowing the use of languages besides English in polling places (1973); law requiring county clerks to recruit bilingual deputy registrars and precinct board members (1973); registration allowed by mail (1975); and the ability of voters in California to vote by absentee ballot for any reason. 2/4/93 Tr., Dr. Romo, pp. 104–09.

77. Imperial County, and the State of California, provide open access to, and an enhanced ability to participate in, state and local elections. To be *eligible for nomination* to the ECESD a candidate need only (1) be a citizen of the United States; (2) be 18 or older; (3) become a voter in California at least 88 days prior to the election; and (4) complete and file a declaration of candidacy at least 88 days prior to the primary election. Cal.Educ.Code §§ 5012, 5032. These requirements make it possible for nearly any citizen over the age of 18 who has lived in El Centro for at least three months to run for the ECESD Board.

78. California's statutes governing voter registration also provide easy access to, and participation in, the political process. In California, an individual is *eligible to register* to vote if he or she is (1) a United States citizen; (2) 18 years of age; and (3) a resident of California. (California Constitution, Article II, § 2.) Moreover, an individual is qualified to *vote* in any election occurring in his or her jurisdiction as long as he or she has registered to vote at least 29 days prior to the election. Cal.Elec.Code § 301.

79. In California, unlike many states, registration to vote can be accomplished by mail and at no cost to the voter. Cal.Elec.Code §§ 303, 318. Moreover, California election law makes it very easy for interest groups or supporters of candidates to register voters, for: (1) there is no limit on the number of individuals who can act as deputy registrars, (2) any registered voter qualifies to be appointed as a deputy registrar, and (3) deputy registrars may register voters anywhere in the county from which they were appointed (including individual residences). Cal.Elec. Code §§ 302, 307. Furthermore, California law mandates that non-English speaking minority groups be assisted in registering to vote.[5] Thus, California takes affirmative steps to enable language minorities to participate in all elections (whether they be national, state or local) taking place within the State. Recently, Congress passed the federal "motor voter law" which will require all states, once it is fully implemented, to register people when they renew their drivers licenses.

80. Finally, California allows a person to actually *vote* with little difficulty or inconvenience. California allows any registered voter to vote by absentee ballot for any reason. Cal.Elec.Code § 1003. California also provides a bilingual ballot in areas where non-English speaking voters reside.

81. As is readily apparent from the above, the requirements governing access to and participation in state and local elections in California, and Imperial Valley in particular, provide equal opportunity for all individuals to vote, to register to vote, or to run for political office regardless of ethnic or political status. These provisions create an election environment "free of discrimination touching the right to vote." This is demonstrated by the significant increases in Hispanic population, registration and turnout, and by Hispanic electoral success in El Centro City Council, High School District and Elementary District elections.

82. *Racially Polarized Voting.* As already discussed, racially polarized voting between Anglos and Hispanics is not responsible for the defeat of Hispanic candidates except in 1985 and 1987, and no longer is sufficient to defeat the preferred candidate of Hispanic voters.

83. *Effects of Other Discrimination.* Plaintiff historian Dr. Romo testified about official and other discrimination against Hispanics in California, Imperial County and El Centro from the admission of California into the United States in 1848 up to 1970. The Foreign Miners Tax, directed at Asian and Mexican miners, was passed in 1851 but repealed in 1854. The Anti-Vagrancy or "greaser" Act was passed in 1850 and repealed in 1854. There was vigilante style violence against Mexicans in the late 19th century in Southern California, and labor violence in the Imperial Valley in the 1920's. There was school segregation in El Centro. Some California counties, but not Imperial County, systematically excluded Hispanics from grand juries. 2/4/93 Tr., pp. 112–116.

84. One should note that at the time of the original California Constitution, there were only 7,000 to 10,000 Mexicans in California and until 1900 comparatively few Mexicans resided in California. 2/4/93 Tr., pp. 98–100. From 1900 to 1930 there was a large migration of Mexicans into California, primarily at the request of growers, while at the same time the U.S. Congress passed laws in 1917, 1921, and 1924 which limited European immigration. California set up an Immigration and Housing Agency in the 1920's devoted solely to dealing with the influx of these Mexican migrants and bettering their living conditions. 2/4/93 Tr., 98–100, 119. The period from 1970 to 1990 was marked by a large migration of Mexicans into the Imperial Valley and El Centro. These new residents brought with them low socioeconomic status and education levels. 2/4/93 Tr., pp. 74–85.

85. Dr. Romo's testimony was pre–1970, did not consider recent Hispanic population growth or relate past discrimination to current employment, socioeconomic status, political participation or electoral success. *LU-*

---

**5.** Where more than 3% of the voting age residents of a California county lack English skills, the County Clerk is required to recruit interested citizens and organizations to assist in the registration of individuals lacking such English skills. Cal.Elec.Code §§ 302, 307.

*LAC v. Clements,* 999 F.2d 831, 867 (5th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) (must be nexus between past discrimination and current lack of political participation). Hispanics are characterized by lower socioeconomic status than Anglos, but many Hispanics in El Centro have immigrated recently from Mexico, a third world country, and naturally are characterized by lower socioeconomic status. Dr. Romo admitted that the foreign born Hispanic population is characterized by lower socioeconomic status and education than Hispanics born in this country. Socioeconomic differences between Hispanics and nonHispanics narrow with each generation. 9/21/94 Tr., Dr. Morrison, p. 122; 2/4/93 Tr., Dr. Romo, pp. 84–85. Dr. Loewen conceded that the lower socioeconomic status of immigrants, or of those unable to speak English, is not due to discrimination in this country. 2/3/93 Tr., Dr. Loewen, pp. 115ff. Therefore, it is critical to distinguish between foreign born and native born Hispanics in addressing this Senate factor. Plaintiffs' evidence failed to make this distinction.

86. As lower socioeconomic status typically is associated with lower political participation for all groups (9/21/94 Tr., Dr. Morrison, p. 121), Hispanic voting age citizens in El Centro have lower registration and turnout rates than nonHispanic voting age citizens. Dr. Loewen admitted that Hispanics are disproportionately concentrated in the younger adult 18–30 age bracket which for all groups typically votes less, white Anglos are disproportionately concentrated in older age brackets which for all racial and ethnic groups is the one most likely to register and vote. 2/3/93 Tr., Dr. Loewen, p. 113. Dr. Loewen further admitted that recency of residence will depress voting and that the Hispanic share of the total population has increased significantly in the last 20 years as a result of immigration from Mexico. *Id.* at 114–115.

87. Blacks residing in El Centro and the Imperial Valley also experienced historical discrimination. Black children, for example, attended segregated schools in El Centro. 2/3/93 Tr., McFadden, pp. 190–93; 9/27/94 Tr., Newton, p. 2; 9/27/94 Tr., McGee, p. 106.

The separate Frederick Douglass High School for children of color existed from the 1920's into the 1950's. 9/27/94 Tr., McGee, pp. 110–112. The El Centro school board minutes and other documentation reflected that as far back as the 1920's Hispanic parents had requested that their children be allowed to attend school with Anglo students rather than attend a school with African-American students, and that Mexican-Americans preferred to live in locations besides El Centro because El Centro had an established African-American community. 2/4/93 Tr., Dr. Romo, pp. 138, 142–43; 9/27/94 Tr., McGee, pp. 112–13. Nonetheless, African-Americans actively participate in El Centro's political structure and have been elected to the El Centro City Council and Elementary School District since the mid–1960's. 9/27/94 Tr., McGee, pp. 107–08; Exs. ER, FB. African Americans have had a continuous presence on the El Centro Elementary School District since 1982 and the El Centro City Council since 1985. Exs. ER, FB. African-American witnesses testified that their attendance at segregated schools did not affect their desire or willingness to register to vote or to vote in El Centro's elections. 9/27/94 Tr., Newton, p. 4; 9/27/94 Tr., McGee, pp. 106–07. African Americans are more politically cohesive in El Centro than any other group.

88. *Other Election Devices.* El Centro does not employ unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices or procedures that may enhance the opportunity for discrimination against minorities. Indeed, El Centro's plurality win rule is considered a minority enhancing device. *Brewer v. Ham,* 876 F.2d 448, 454 (5th Cir.1989).

89. *Minority Electoral Success.* As already discussed, Hispanics have been elected twelve times to the El Centro City Council, four times to the High School District Board on which they have held a seat since 1975 except for one four-year period, and have been elected on three occasions to the Elementary Board. Hispanic electoral defeats in School Board races since 1985 have not been due to the at-large election system.

90. *Slating.* There is no official slating of candidates in School Board elections. Plaintiffs contend that the teachers' union slates candidates but in fact all the union does is endorse candidates and contribute money to its endorsed candidates. Minority candidates have as much access to the union endorsements and money as Anglo candidates. Indeed, five of the nine candidates endorsed by the union since 1985 have been minorities.

91. *Racial Appeals.* There is no evidence that political campaigns in the last 20 years have been characterized by overt or subtle racial appeals.

92. *Responsiveness.* There is evidence that during a transition period with a new superintendent in 1990-91 that there were deficiencies in the District's bilingual program, but when brought to the attention of the Board these deficiencies were promptly corrected. 9/27/94 Tr., Moreno, p. 82. The Board unanimously approved a bilingual education master plan in May of 1991. *Id.* at 76. Through an innovative early hiring program, the District increased its bilingual teaching staff from 36 to 63 along with 25 language development specialists despite a tremendous shortage statewide in bilingual certificated teachers. 9/27/94 Tr., Moreno, pp. 77-78, 82; 9/27/94 Tr., Taylor, p. 56. The District does not offer a bilingual stipend as two other districts in Imperial Country do, but ECESD pays its teachers more without a stipend than these districts, is in the upper quartile statewide in teacher salaries and has been hiring teachers away from the districts that do have stipends. 9/27/94 Tr., Taylor, pp. 53-61; Ex. UU. ECESD was one of the few districts in Imperial Valley with no noncompliant items in the most recent state compliance review of bilingual education programs. 9/21/94 Tr., Taylor, p. 150. Bilingual education is not a continuing controversy in the District. 9/27/94 Tr., Newton, p. 10; 9/27/94 Tr., Taylor, p. 64; 9/27/94 Tr., Moreno, p. 82. El Centro does as good or a better job in meeting the needs of limited English proficient ("LEP") students than most districts in the Imperial County area. 9/27/94 Tr., Moreno, pp. 82-83.

93. *Tenuousness.* Far from being tenuous, there are solid policy reasons for maintaining the at-large election system. El Centro is too small for districts. 9/27/94 Tr., McGee, pp. 114-115. El Centro's type of at-large system is the most effective type of at-large election system for electing minorities, and with rising Hispanic population and registration and declining Anglo population, there is no longer any advantage to districts for Hispanics in this majority minority school district. 9/22/94 Tr., Dr. Rabinovitz, pp. 13-21, 25, 39; Ex. FK. Hispanics are not unable to elect at-large, yet districts would preclude Blacks, 60% of whom are in plaintiffs' *Thornburg* district, from electing their candidates. 9/22/94 Tr., Dr. Rabinovitz, p. 42. In a district election system where voters cast one vote every four years, bullet voting is not possible, each group tends to vote first for a candidate from their group, and the most votes win, Hispanics would overwhelm Blacks in the plaintiffs' *Thornburg* district. *Id.* at 42-43. Plaintiffs' own expert Dr. Loewen conceded this might happen. 2/2/93 Tr., Dr. Loewen, p. 123. If the district were redrawn so that Blacks were placed in a different district, they would be overwhelmed by Anglos who likely would prefer an Anglo in a one vote district format. 9/22/94 Tr., Dr. Robinovitz, p. 43; 9/27/94 Tr., Newton, pp. 21-22. Their best chance to elect is in a 2 or 3 seat at-large election format where bullet voting is permitted and a candidate need not finish first, or obtain a majority, to win. As Hispanics are able to elect at-large (9/22/94 Tr., Rabinovitz, pp. 49, 59), Dr. Rabinovitz testified that the existing system is best for all groups. 9/22/94 Tr., Dr. Rabinovitz, pp. 43-44.

### CONCLUSIONS OF LAW

A. *Applicable Legal Standards.*

1. Plaintiffs' sole claim for relief is based on Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, under which plaintiffs must prove, based on "the totality of the circumstances," that a challenged electoral procedure "results" in the "dilution" of minority voters' electoral opportunities:

"(a) No voting ... standard, practice, or procedure shall be imposed or applied by any ... political subdivision in a manner which results in a denial or abridgment of

the right of any citizen of the United States to vote on account of race or color. . . .

"(b) A violation of subsection (a) of this section is established if, based on *the totality of circumstances,* it is shown that the political processes leading to nomination or election in the . . . political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that *its members have less opportunity than other members of the electorate* to participate in the political process and *to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

(emphasis added in part). Jurisdiction exists under 28 U.S.C. § 1331.

2. As a threshold to this totality of the circumstances analysis, however, the United States Supreme Court has held that plaintiffs challenging an electoral system under Section 2 must prove the existence of three "necessary preconditions." *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986). *Thornburg's* three preconditions are: "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district . . . Second, the minority group must be able to show that it is politically cohesive . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

*Id.* at 50–51, 106 S.Ct. at 2766–67. The twin elements of minority political cohesion and white bloc voting are the components of racially polarized voting. *Romero v. City of Pomona,* 883 F.2d 1418, 1423 (9th Cir.1989).

3. Under *Thornburg's* first precondition, plaintiffs must create a hypothetical, single member district in which Hispanics will constitute an "effective voting majority." *Thornburg,* 478 U.S. at 38, 106 S.Ct. at 2759–60. The rationale for this requirement is that unless plaintiffs are "able to elect" in a single member district, the at-large system "cannot be responsible for minority voters' inability to elect." *Id.* at 50, 106 S.Ct. at 2766.

4. Under *Thornburg's* second precondition, plaintiffs must prove that Hispanics are "politically cohesive." *Id.* at 51, 106 S.Ct. at 2766–67. If Hispanics are not politically cohesive, "it cannot be said that the selection of a multimember electoral structure [at-large system] thwarts distinctive minority group interests." *Id.* In *Gomez v. Watsonville,* 863 F.2d 1407, 1415 (1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989), the Ninth Circuit held that the inquiry into political cohesiveness is "essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority."

5. Under *Thornburg's* third precondition, plaintiffs must prove that (1) white bloc voting [6] (2) "usually" [7] defeats the preferred candidate of minority voters (3) in the absence of special circumstances. *Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2766–67. Plaintiffs must prove more than racially polarized or white bloc voting. To be *legally significant,* white bloc voting must "regularly defeat[s] the choices of minority voters." *Thornburg,* 478 U.S. at 48, 106 S.Ct. at 2765; *Overton v. City*

6. Obviously, "[a]scertaining whether legally significant white bloc voting exists begins with the identification of the minority members 'preferred candidates' or 'representatives of their choice' . . . The proper identification of minority voters 'representatives of their choice' is critical." *Collins v. City of Norfolk,* 883 F.2d 1232, 1237 (4th Cir.1989). White bloc voting, and the voting preferences of each minority group, and of Anglos, typically are proven by the statistical methods of exit polls, ecological regression analysis, homogeneous precinct analysis, and anecdotal

testimony. *Romero v. City of Pomona,* 883 F.2d at 1423. The Ninth Circuit has stressed the primacy of "voting preferences expressed in actual elections," *Gomez v. City of Watsonville,* 863 F.2d at 1415, and "actual voting patterns." *Id.* at 1416.

7. "Usually" has been interpreted to mean "more often than not." *Williams v. State Board of Elections,* 718 F.Supp. 1324, 1328 (N.D.Ill.1989).

*of Austin,* 871 F.2d 529, 538 (5th Cir.1989); *Williams v. State Board of Elections,* 718 F.Supp. 1324, 1328 (N.D.Ill.1989); *Valladolid v. National City,* 976 F.2d 1293, 1296 (9th Cir.1992). Otherwise, "minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates." *Thornburg,* 478 U.S. at 48–49, n. 15, 106 S.Ct. at 2765–66, n. 15.

■ 6. Failure to prove any one of the three *Thornburg* preconditions is fatal to the plaintiffs' claim. *Romero v. City of Pomona,* 883 F.2d at 1422; *Overton v. City of Austin,* 871 F.2d at 538; *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 944–45 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Collins v. City of Norfolk,* 816 F.2d 932, 935 (4th Cir.1987); *Buckanaga v. Sisseton Ind. School Dist.,* 804 F.2d 469, 472 (8th Cir.1986). If any one these three preconditions is not met, there is no need to consider the totality of the circumstances or the presence of the "Senate factors" utilized by courts to prove Section 2 violation prior to its amendment in 1982.[8] The Senate factors are now of secondary relevance and only must be considered if plaintiffs prove each one of *Thornburg's* three preconditions. 478 U.S. at 47–48 n. 15, 106 S.Ct. at 2764–65 n. 15; *see also* at 92, 106 S.Ct. at 2788 (O'Connor, J., concurring in the judgment); *Romero v. City of Pomona,* 665 F.Supp. 853, 860 (C.D.Cal.1987), *aff'd,* 883 F.2d 1418, 1421 (9th Cir.1989). These Senate factors are not exhaustive of the factors that a court may consider. *Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2763–64 (Senate factors "neither comprehensive nor exclusive").

7. The Supreme Court, moreover, has ruled that, even if plaintiffs prove each one of *Thornburg's* three preconditions, they cannot prevail unless the totality of the circumstances demonstrates that the minority group does not have an equal opportunity to participate in the electoral process and elect candidates of its choice:

"... if *Gingles* so clearly identified the three as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three necessarily and in all circumstances demonstrated dilution. This was true ... because the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts. Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence *in the totality of the circumstances ... and without isolating any other arguably relevant facts from the act of judgment.*

*Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 2656–58, 129 L.Ed.2d 775 (1994).

8. S.Rep. No. 417, 97th Cong. 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad.News 177, 205. These factors are as follows:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity of discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by over or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.... whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.... whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles v. Edmisten,* 590 F.Supp. 345, 354 (E.D.N.C.1984), *aff'd in part, rev'd in part, Thornburg,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (quoting S.Rep. No. 97–417).

*See also Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993) (three *Thornburg* factors not enough "if other considerations show that the minority has an undiminished right to participate in the political process"); *Salas v. Southwest Texas Junior College District,* 964 F.2d 1542, 1555–56 (5th Cir.1992) (plaintiffs proved all three *Thornburg* factors but lost under totality of circumstances test). This Court, then, not only *can* consider totality of the circumstances evidence, but is *required* to do so, before plaintiffs can prevail. *Nipper v. Smith,* 39 F.3d 1494, 1512–13 (11th Cir.1994) ("under *De Grandy,* reviewing courts are required—not just invited—to look beyond the *Gingles* threshold factors").

8. Ultimately, for plaintiffs to prevail in a Section 2 case, the Court after considering the totality of the circumstances must make a finding of "vote dilution." *Thornburg,* 478 U.S. at 77–79, 106 S.Ct. at 2780–81; *see also Salas v. Southwest Texas Junior College District,* 964 F.2d at 1552–53. Vote dilution occurs when the candidates preferred by minority voters lose under an at-large system who could have been elected in a single member district containing a majority of minority voters. *Thornburg,* 478 U.S. at 68, 106 S.Ct. at 2775. Vote dilution, then, is a comparative inquiry where the court must measure a minority group's ability to elect under the existing system to some "alternative system that would provide greater electoral opportunity to minority voters," which under *Thornburg* is single member districts. *Holder v. Hall,* — U.S. —, —, 114 S.Ct. 2581, 2586, 129 L.Ed.2d 687 (1994). Indeed, Justice O'Connor specifically noted in *Holder* that lack of success under an electoral arrangement, when compared to the success predicted under the measure of undiluted

voting strength, is powerful evidence of vote dilution. *Id.* at —–—, 114 S.Ct. at 2589–90. That is the measure of equal opportunity to elect under Section 2(b) of the Voting Rights Act.

■ 9. At-large elections, therefore, are not invalid *per se. Thornburg,* 478 U.S. at 48, 106 S.Ct. at 2765. Nor is it the case that minority voters are entitled to proportional representation. Section 2 explicitly disavows any such requirement or standard. 42 U.S.C. § 1973(b). Nor are minority voters entitled to electoral arrangements that maximize their voting strength. *Holder v. Hall,* — U.S. at —, 114 S.Ct. at 2590 (O'Connor concurrence) (citing *Romero v. Pomona,* 883 F.2d 1418, 1425 n. 10 (9th Cir.1989)); *McGhee v. Granville County,* 860 F.2d 110, 119–20 (4th Cir.1988); *Latino Political Action Committee v. City of Boston,* 784 F.2d 409, 412–13 (1st Cir.1986).

**B.** *Ability to Elect is the Legal Standard for Proving the First Thornburg Precondition.*

■ 10. Proving an "ability to elect" in a single member district is an essential element of a Section 2 vote dilution claim. *Thornburg* was an "ability to elect" case, 478 U.S. at 46, n. 12, 106 S.Ct. at 2764 n. 12 ("the claim we address ... is ... plaintiffs ... *ability to elect* "), premised on *proof* that Blacks in that case had the ability to elect in a single member Black majority district. *Id.* at 38, 106 S.Ct. at 2759–60. The Supreme Court uses the phrase "ability to elect" no less than 16 times in the opinion[9]. An ability to elect in a single member district, combined with racially polarized voting, is what establishes causation and proves vote dilution.[10] If there is no "ability to elect", then there is no dilution and the at-large system "cannot be responsible for minority voters'

---

9. *See, e.g., id.* at 48, 106 S.Ct. at 2765. ("Minority voters ... must prove that the use of a multimember [at-large] electoral structure operates to minimize or cancel out their *ability to elect* their preferred candidates"); at 48, 106 S.Ct. at 2765 (if *Thornburg* preconditions not met, at-large system "will not impede the *ability* of minority voters *to elect* ") (emphasis added in all quotes).

10. The single, underlying theme of all three *Thornburg* preconditions is *causality* in that the

at-large system must be responsible for minority electoral defeat—minority electoral defeat must be *caused* by the at-large system. *Id.* at 50, fn. 17, 106 S.Ct. at 2766, fn. 17 ("[This standard] thus would only protect racial minority votes from diminution *proximately caused* by the districting plan"). *See also Salas v. Southwest Texas Junior College District,* 964 F.2d at 1553–1555 (proof of causality required; ultimate inquiry is whether at-large system causes vote dilution).

inability to elect its candidates." *Id.* at 50, 106 S.Ct. at 2766.

11. Plaintiffs prove an "ability to elect" by meeting *Thornburg*'s first precondition, *i.e.*, proving that Hispanics can constitute an "effective voting majority" in a single member district. In *Thornburg*, the Supreme Court reported that at the time the multi-member (at-large) districts in that case were created, "there were concentrations of Black citizens ... that were sufficiently large and contiguous to constitute *effective voting majorities* in single member districts." *Id.* at 38, 106 S.Ct. at 2759–60. (Emphasis supplied). The Court uses the term "effective voting majorities," "voting majorities," or "voters" no less than 10 times in the opinion.

12. The *Thornburg* trial court struck down six at-large North Carolina state legislative districts and one single member district that fragmented Black voting strength. In this latter district, Black citizens were 55.1% of the total population but only 46.2% of the registered voters in the district. According to the *Thornburg* trial court, "[t]his does not constitute then an effective voting majority." *Gingles v. Edmisten,* 590 F.Supp. 345, 358 (E.D.N.C.1984), *aff'd in part, rev'd in part, sub. nom. Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). It adopted instead a plan in which black citizens would constitute 60.7% of the total population and 51.10% of the registered voters. 590 F.Supp. at 359. In creating districts to replace the six at-large legislative districts, in every instance the trial court created majority districts with a sufficient number of black citizens to ensure that black registered voters exceeded 50%. *Id.* at 378. To the *Thornburg* trial court, an "effective voting majority" was a majority capable of

electing representatives of choice "solely by its group voting strength."[11] *Id.* at 381.

13. *Thornburg*'s first precondition, then, *presumes* that a majority-minority district will have a sufficient number of minority people to field a cohesive majority of voters in the proposed *Thornburg* district on election day. *See Thornburg,* 478 U.S. at 50–51, fn. 17, 106 S.Ct. at 2766–67, fn. 17 ("minority voters must be sufficiently concentrated and politically cohesive that a putative districting plan would *result* in districts in which members of a racial minority would constitute a *majority of the voters*") (emphasis added). This is not unusual for courts fashioning remedies in voting rights cases. Courts often create districts with minority population supermajorities to ensure that the minority group will be a majority of the voters in the district. *See, e.g., United Jewish Organizations v. Carey,* 430 U.S. 144, 163–64, 97 S.Ct. 996, 1008–09, 51 L.Ed.2d 229 (1977) ("*substantial* nonwhite population majority—in the vicinity of 65%—would be required to achieve a nonwhite majority of eligible voters"); *Ketchum v. Byrne,* 740 F.2d 1398, 1413, 1415–16 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985) (minority population of 65% required to ensure fair opportunity to elect); *Martin v. Mabus,* 700 F.Supp. 327, 335 (S.D.Miss. 1988) (black supermajority needed to elect because of lower Black voter registration); *Fletcher v. Golder,* No. 91–2314C(7), 1992 WL 105910 1992 U.S.Dist. LEXIS 5894 (E.D.Mo. Feb. 4, 1992) (66% black VAP needed to elect; district where black voter turnout would be only 46% rejected); *Fund for Accurate and Informed Representation, Inc. v. Weprin,* 796 F.Supp. 662 (N.D.N.Y. 1992), *aff'd,* 506 U.S. 1017, 113 S.Ct. 650, 121 L.Ed.2d 577 (1992) (alleged packing of minorities upheld because less than a 65% super-

---

**11.** This seminal discussion warrants full quotation:

"There is, first off, the fact that the principle cases authoritatively developing the vote dilution concept have involved the impact of districting upon *effective voting majorities.* [citations omitted] Confined to such measurable aggregations, the concept has a principled basis which permits rational and consistent, albeit sometimes difficult, application; not so confined, it lacks any such basis. That is to say, *at the effective voting majority level;* it is possible to say with substan-

tial assurance that to submerge or fracture such an aggregation in a racially polarized voting situation effectively deprives it of the presumptive capability to elect, *solely by its group voting strength,* representatives 'of its choice.' ... There must obviously be some size (as well as dispersion) limits on those aggregations of voters to whom the concept can properly be applied. We do not readily perceive the limit short of the effective voting majority level that can rationally be drawn and applied."

*Id.* at 381.

majority "may lead to ineffective minority control districts").

14. Several cases specifically have rejected Hispanic districts where the eligible voter population did not take into account lack of citizenship, low registration and low turnout, so as to ensure the ability to elect. In *Puerto Rican Legal Defense and Educ. Fund v. Gantt*, 796 F.Supp. 681, 689–690 (E.D.N.Y.1992), the district court expressly rejected any "bright-line" 65% standard (as did the *Thornburg* trial court) noting that "[e]ven higher VAP percentages may be required in Hispanic districts to account for their even lower citizenship ratio, lower voter turnout, and lower voter registration." See also *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex.1991) (50% Hispanic VAP district rejected; 51.5% registration majority district imposed); *De Grandy v. Wetherell*, 794 F.Supp. 1076, 1084 (N.D.Fla.1992) (VAP increased to ensure registration majority), *aff'd in part, rev'd in part, sub. nom., Johnson v. De Grandy,* — U.S. —, — – —, 114 S.Ct. 2647, 2655–56, 129 L.Ed.2d 775 (1994) (Supreme Court declined to reach this question). Obviously, these cases are attempting to create "effective voting majorities" that are "able to elect."

15. Ultimately, then, the Court must satisfy itself that Hispanics have the *ability to elect* in plaintiffs' *Thornburg* district, that there is a reasonable likelihood that Hispanics will elect their preferred candidate there. Recently, the Supreme Court described the test as "a good chance of electing." *Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993). *See also, Ketchum v. Byrne*, 740 F.2d at 1413 ("a realistic opportunity to elect"); *Carstens v. Lamm*, 543 F.Supp. 68, 86 (D.Colo.1982) (minority population too small "to exercise political control" over a district); *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 647 (N.D.Ill.1991) ("reasonable opportunity to control a district"). Districting cases often speak of "safe" districts. *E.g., Hines v. Mayor and Town Council of Ahoskie*, 998 F.2d 1266, 1273 (4th Cir.1993); *Houston v. Lafayette County, Mississippi*, 841 F.Supp. 751, 765–66 (N.D.Miss.1993). Without a meaningful ability to elect, districting would

be "a Pyrrhic victory" and a "hollow remedy." *Overton v. City of Austin*, 871 F.2d at 542 (concurrence), reaffirmed in *Westwego Citizens for Better Government v. City of Westwego*, 906 F.2d 1042, 1047 (5th Cir.1990); *Ketchum*, 740 F.2d at 1413 ("no point" in providing a remedy which "will not in fact provide realistic opportunity to elect"); *Brewer v. Ham*, 876 F.2d 448, 452 (5th Cir. 1989).

16. Plaintiffs, however, contend that there exists a "bright line" test for proving the first *Thornburg* precondition. They contend that the legal standard for proving the first *Thornburg* precondition is a voting age citizen majority. Yet, in a glaring contradiction, plaintiffs also contend that the fact that Hispanics are now a voting age citizen majority in all of El Centro does not prove an ability to elect at-large nor foreclose a Section 2 vote dilution claim. Plaintiffs confuse the applicable *legal standard* with *evidence*.

17. The legal standard is not total population, voting age population, voting age citizen population or registration, but the ability to elect. The Supreme Court repeatedly has declined to elevate any of these *factual* measures to a "magic parameter." *Johnson v. De Grandy*, — U.S. —, — – —, — n. 14, 114 S.Ct. 2647, 2655–56, 2660 n. 14, 129 L.Ed.2d 775 (1994); *Growe v. Emison*, 507 U.S. 25, 39 n. 4, 113 S.Ct. 1075, 1083, 122 L.Ed.2d 388 n. 4 (1993). The dispositive issue is whether, utilizing any of these factual measures, minority plaintiffs are sufficiently numerous in a single member district to be likely to field a cohesive ("effective") voter majority "able to elect" their preferred candidate. That is what an "effective voting majority" means, a phrase used several times in *Thornburg* and embraced again by the Supreme Court in the recent *Johnson v. De Grandy* decision, which used the phrase five times in describing minority majority districts. — U.S. at —, —, —, — n. 19, 114 S.Ct. at 2658, 2660, 2662, 2663 n. 19 (1994). The court clearly was measuring the electoral power of the minority districts at issue in the case by whether the ability to elect was present in those districts.

372

18. Examination of the district court opinion under review by the Supreme Court in *Johnson* reinforces this conclusion. Much of the district court opinion is devoted to a discussion of how concentrated Hispanic and Black districts had to be, for those districts to be "effective." *De Grandy v. Wetherell,* 815 F.Supp. 1550, 1563–68, 1574–75 (N.D.Fla. 1992). Significantly, the district court repeatedly determined that an Hispanic VAP (voting age population) supermajority was necessary for an "effective" district in order to account for noncitizenship, *registration and turnout. Id.* at 1564 (supermajority "necessary to account for the fact that many Hispanics are noncitizens and have lower voter registration rates"); *Id.* at 1567, 1567 n. 28, 1575 (court concludes Hispanic supermajority necessary to elect candidates of choice because of noncitizenship and lower voter registration and turnout rates); *Id.* at 1578 (additional Hispanic district rejected because it would make a Black district "ineffective" in terms of its ability to put Blacks "in control on election day"). Registration, turnout and electoral outcome evidence was submitted and determinative, as the trial itself revolved around "what constituted a 'supermajority' of Hispanic VAP sufficient to enable Hispanics to elect a candidate of their choice." *Id.* at 1564.

19. Apparently, there was a dispute among the parties whether total population, voting age population or voting age citizen population was the relevant measure of electoral power, with the trial court choosing voting age as the proper measure. The Supreme Court in the *Johnson* opinion declined to resolve this dispute, as it was unnecessary to the outcome. *Johnson,* —— U.S. at —— ——, 114 S.Ct. at 2655–56. In footnote 14, however, the Court commented that the measure was not a "magic parameter." *Id.* at ——, 114 S.Ct. at 2660. That is because the dispositive consideration is not voting age or voting age citizenship. If it were, the Court would not be utilizing *supermajorities* to account for age, citizenship, registration and turnout differences. A voting age (or voting age citizen) *majority* would do. Obviously, the dispositive consideration is whether the proposed minority districts are "effective," i.e., containing "effective voting majorities"

that are "able to elect" the Hispanic preferred candidates, which means a likely turnout majority on election day. If not, then plaintiffs have failed to prove that Hispanics can be elected under the alternative single member electoral mechanism that they propose. This means that there is no vote dilution under Section 2 of the Voting Rights Act.

20. This makes the first *Thornburg* test a factual inquiry. *Westwego Citizens for Better Government v. City of Westwego,* 906 F.2d 1042, 1046–47 (5th Cir.1990) ("the appropriate method of establishing the first *Thornburg* factor is a 'matter of fact' which the plaintiffs must prove, but there is no uniform method"). Thus, registration and turnout evidence, as well as election outcome evidence, are relevant to determining whether Hispanics have the ability to elect, either in plaintiffs' *Thornburg* district or citywide, as numerous courts have held. Indeed, Justice O'Connor specifically noted in *Holder* that lack of success under an electoral arrangement, *when compared to the success predicted under the measure of undiluted voting strength,* is powerful evidence of vote dilution. *Holder,* —— U.S. at —— —— ——, 114 S.Ct. at 2589–90.

■ 21. Thus, demonstrating that Hispanics are a majority of voting age citizens is simply one *evidentiary* method of proving an ability to elect. While a voting age citizen majority may be evidence from which it may be inferred that a group can generate a cohesive majority of voters, this inference may be disproved and, in this case quite clearly is, by other evidence that Hispanics were not a registration or turnout majority in plaintiffs' *Thornburg* district in 1985 or 1987. Indeed, *Thornburg* itself was a case where the evidence for concluding that a 55% population majority was insufficient to elect was a registration level of 46%. Obviously, registration was treated as relevant *evidence* in determining whether a particular population level was capable of producing a cohesive majority of the voters. In its remedy, the *Thornburg* trial court in every instance adopted districts that contained Black registration majorities which ensured that Blacks had the ability to elect in those districts.

22. Plaintiffs assert that the Ninth Circuit in *Romero* and *Gomez* endorsed the eligible voter majority standard. Yet neither of those cases addressed the fact situation presented here. In *Romero*, Hispanic plaintiffs unsuccessfully attempted to prove the first *Thornburg* precondition with an Hispanic population majority but failed because they were not a voting age or voting age citizen majority in their proposed *Thornburg* district. In *Gomez*, there was never any challenge to plaintiffs' showing of population majorities with registration data by defendant. The only issue on appeal was cohesion; the first *Thornburg* requirement was not even in dispute. These cases merely stand for the proposition that *at least* an eligible voter majority is required; the Ninth Circuit was not presented in either of those cases with the issue presented here—an eligible voter majority that is not a registration or turnout majority. Neither Ninth Circuit nor district court cases in the Ninth Circuit have ever addressed the issue presented by this case. The Supreme Court has never endorsed plaintiffs' standard; indeed it has declared that there is no "magic parameter."

C. *As a Matter of Law, There Was No Vote Dilution in the Elections of 1985 and 1987.*

23. Within plaintiffs' proposed *Thornburg* district, Hispanics were only 46.4% of registration in 1985, approximately 50% in 1987. They were but 36% of those turning out to vote in 1985, 39% in 1987 within the *Thornburg* district. This was not a district capable of turning out an effective voting majority on election day. Thus, there was no vote dilution in the 1985 and 1987 elections *as a matter of law*, because Hispanics were not an "effective voting majority" in a single member district that was "able to elect" at the time of those elections. *Past* losses do not constitute vote dilution or a Section 2 violation, unless there existed an ability to elect in a single member district *at that time.*

24. Numerous courts have dismissed voting rights cases where plaintiffs have failed to prove the first *Thornburg* precondition. *Romero v. City of Pomona*, 665 F.Supp. 853 (C.D.Cal.1987), *aff'd*, 883 F.2d 1418 (9th Cir.1989); *McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Skorepa v. Chula Vista*, 723 F.Supp. 1384 (S.D.Cal.1989). The fact that white bloc voting usually defeated minority-preferred candidates in those cases was insufficient to prove dilution. There is, in other words, no dilution *unless* there is an alternative electoral mechanism under which plaintiffs could expect to do better. *Holder v. Hall*, ___ U.S. at ___, 114 S.Ct. at 2586. As Justice O'Connor's concurring opinion in *Holder* says, "In order for an electoral system to dilute a minority group's voting power, there must be an alternative system that would provide greater electoral opportunity to minority voters." Vote dilution occurs when a minority candidate loses at-large when he or she could have won in a single member district.

25. Thus, because plaintiffs were unable to elect in a single member district in 1985 and 1987, there was no vote dilution. *As a matter of law*, plaintiff suffered no injury and there was no Section 2 violation.

26. The fact that Hispanics *now* have the ability to elect in a district does not mean that past losses suddenly constitute dilution nor does it mean that Hispanics are *presently* unable to elect at-large. Hispanics today are a voting age citizen majority in the entire ECESD; their registration has increased from 26% to 42% and their turnout from 18% to 31%. One cannot use losses in 1985 and 1987 when registration and turnout were lower, and Hispanics did not have the ability to elect in a single member district, to claim dilution in 1994. One must judge dilution from the point in time when Hispanics became able to elect in a district. As there were no elections after 1987 where Anglo bloc voting defeated the preferred candidate of Hispanic voters, there has never been any injury or vote dilution or Section 2 violation.

27. While Hispanics *presently* have the ability to elect in a single member district, this Court also has determined that Hispanics *now* have the ability to elect at-large. There is no current condition of vote dilution in El Centro.

### D. *Special Circumstances.*

28. The United States Supreme Court in *Thornburg* held that an isolated minority success should be given less probative value if explained by "special circumstances." 478 U.S. at 57, 106 S.Ct. at 2769–70. Examples of special circumstances are a minority candidate running unopposed (a racially uncontested election), incumbency or because of pending litigation, Anglos give unusual support to minority candidates to defeat the lawsuit. *Id.* at 76, esp. n. 37, 106 S.Ct. at 2779–80, esp. n. 37 Another example is the failure to constitute a majority of voters turning out to vote where the group is a registration majority. *Salas,* 964 F.2d at 1546. Still another example of "special circumstances" is a minority winning because Anglos split their votes among more Anglo candidates than seats up for election. *Perkins v. City of West Helena, Ark.,* 675 F.2d 201, 203 (8th Cir.1982), *aff'd,* 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982); *Taylor v. Haywood County, Tenn.,* 544 F.Supp. 1122, 1127 (W.D.Tenn.1982); *Neal v. Coleburn,* 689 F.Supp. 1426, 1436 (E.D.Va.1988); *Windy Boy v. County of Big Horn,* 647 F.Supp. 1002, 1014–15 (D.Mont.1986); *NAACP v. City of Columbia,* 850 F.Supp. 404, 418, esp. n. 12 (D.S.C.1993), *aff'd in relevant part,* 33 F.3d 52 (full opinion at 1994 WL 449081, 1994 U.S.App. LEXIS 22726) (4th Cir.1994). These same factors can work in reverse to explain a minority defeat under the "totality of the circumstances" test. *Nipper,* 39 F.3d at 1535–37.

29. Some courts in voting rights cases have given less weight to elections that are not "racially contested," such as where a minority candidate runs unopposed or there are only white candidates running for a particular seat. As explained in *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 503 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989), "the race of the candidate is in general of less significance than the race of the voter— but only within the context of an election that offers voters the choice of supporting a viable minority candidate." Thus, courts in Section 2 cases tend to look primarily at racially contested elections ("black preference is de-

termined from elections which offer the choice of a black candidate"). 834 F.2d at 504. ·Other courts consider probative any election, even one involving only Anglo candidates, in which voting is polarized or Anglo and minority preferences differ. *Nipper,* 39 F.3d at 1540.

■■■ 30. In 1989, winning Anglo candidate Lucille Duggan was preferred by Hispanic voters over Larry Osa an Hispanic. Therefore, she was the Hispanic preferred candidate. Duggan was not the Anglo preferred candidate but won anyway. Plaintiffs suggest that Duggan's victory should be discounted because an Anglo had to win. Their contention is based on a misreading of *Collins v. City of Norfolk,* 816 F.2d 932 (4th Cir.1987). After *Thornburg* was decided, the Fourth Circuit remanded *Collins* to the district court with instructions that the mere fact that Black voters may have preferred Anglo candidates who were elected does not defeat a Section 2 claim if they preferred a Black candidate *more* who was defeated. 816 F.2d at 937. Two years later, the Fourth Circuit held that where Black voters favored a Black candidate *first* who lost, the Anglos whom they favored second and third were *not* the Black preferred candidates. *Collins v. City of Norfolk,* 883 F.2d 1232, 1238 (4th Cir.1989). The reason the two Anglos were not considered Black preferences in *Collins* is that there was only one Black candidate running for three seats so that Anglos necessarily would be the second and third Black preferences. 883 F.2d at 1240.

31. Thus, because Hispanics preferred Duggan over Osa in 1989, Duggan was the Hispanic preferred candidate. This was not a white only election. Had there been no Hispanic candidate in the race or if Duggan had been the second Hispanic preference, she would not be regarded as the Hispanic preference. Hispanics, however, preferred her first over Osa and therefore Duggan must be regarded as the Hispanic preference, who was elected in a racially contested election.

32. The 1990 one seat, special election should be given little weight because it was not truly contested. There were no Anglo candidates (two filed but withdrew) and His-

panics gave only 27% of all their votes to Refugio Hernandez, who only moved to El Centro two years before the election and did little campaigning. 31% of Hispanic voters already there at the polls and who voted in the City Council election "rolled off" and plaintiffs' own experts treated this election as barely an election at all. Hernandez, in short, was not a "viable" candidate (which plaintiffs' experts admit was true). Numerous courts have disregarded such elections. *East Jefferson Coalition v. Jefferson Parish,* 691 F.Supp. 991, 1000–1001 (E.D.La.1988), *aff'd,* 926 F.2d 487, 492, 493 (5th Cir.1991); *Campos v. City of Baytown,* 840 F.2d 1240, 1245 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Citizens for a Better Gretna,* 834 F.2d at 503; *Westwego Citizens for Better Government v. Westwego,* 872 F.2d 1201, 1208–1209 (5th Cir. 1989); *Westwego Citizens for Better Government v. City of Westwego,* 946 F.2d 1109, 1118–1119 (5th Cir.1991) (discussion of viable minority candidate). Indeed, one court disregarded all racially contested elections within the challenged jurisdiction on the basis that the Hispanic candidates were not viable candidates, as evidenced by the fact that the candidates received less than 50% support from Hispanic voters. *Garza v. County of Los Angeles,* 756 F.Supp. 1298, 1329 (finding 294), 1335–36 (C.D.Cal.1990). The Court nonetheless found racially polarized voting on the basis of exogenous elections for Congress, State Senate and State Assembly.

■ 33. Plaintiffs contend that Blacks and Anglos should be combined into a single "nonHispanic" group for purposes of applying the third *Thornburg* precondition, that "nonHispanic" bloc voting, instead of "white" bloc voting, usually defeats the preferred candidates of Hispanic voters. The United States Supreme Court, however, has held that groups cannot be combined unless they are cohesive, as demonstrated by their voting patterns. *Growe v. Emison,* 507 U.S. 25, 41, 113 S.Ct. 1075, 1085, 122 L.Ed.2d 388 (1993) (proof of cohesion necessary for finding of bloc voting of "agglomerated" groups). Numerous cases have refused to combine groups that were shown *not* to be politically cohesive. *Romero v. City of Pomona,* 883 F.2d at 1426 (Blacks and Hispanics not cohe-

sive); *Valladolid v. City of National City,* 976 F.2d 1293, 1296–97 (9th Cir.1992) (Anglos and minority class not cohesive); *Badillo v. City of Stockton,* 956 F.2d at 886 (Blacks and Hispanics not cohesive); *Brewer,* 876 F.2d at 448, 453–54 (5th Cir.1989) (Hispanics, Blacks and Asians not cohesive); *Overton,* 871 F.2d at 536 (Blacks and Hispanics not cohesive); *Butts v. City of New York,* 614 F.Supp. 1527, 1546 (S.D.N.Y.), *rev'd as to violation,* 779 F.2d 141 (2d Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (Blacks and Hispanics not cohesive); *Concerned Citizens of Hardee County v. Hardee County Bd. of Comrs.,* 906 F.2d 524 (11th Cir.1990) (Blacks and Hispanics not cohesive); *Latino Political Action Committee v. City of Boston,* 609 F.Supp. 739, 746 (D.Mass.1985), *aff'd,* 784 F.2d 409 (1st Cir. 1986) (Latinos, Asians and Blacks not cohesive); *De Baca v. County of San Diego,* 794 F.Supp. 990, 998–1000 (S.D.Cal.1992) (Latinos, Asians and Blacks not cohesive). Blacks and Anglos are not politically cohesive in El Centro elections, as demonstrated by their disparate voting preferences. Plaintiffs' experts, moreover, initially tendered bivariate analyses but later concluded that those analyses generated inaccurate Hispanic preferences, precisely because Blacks and Anglos who were combined into a nonHispanic voting bloc were voting differently from each other. Given that most voting rights cases concern white bloc voting against Black candidates and the long history of slavery, discrimination and polarized voting between Anglos and Blacks, there is little basis for treating Anglos and Blacks as a cohesive group.

■ 34. Plaintiffs contend that the 1993 election in which Hispanic candidate Efrain Silva won election to the El Centro Elementary School Board should be disregarded because of "special circumstances" that render his victory aberrational. Courts have disregarded elections won by minorities after the initiation of a voting rights suit, where Anglos preferred the minority candidate, or manipulated the election of a safe minority candidate (*Thornburg,* 478 U.S. at 75, 106 S.Ct. at 2779) or provided unusual organized political support (*id.* at 76, 106 S.Ct. at 2779–80)

or campaigned to insure the election of a minority candidate (*id.* at n. 37). The Ninth Circuit recently rejected a claim of special circumstances based on pending litigation where plaintiffs failed to prove unusual Anglo support of minority candidates. *Valladolid v. City of National City*, 976 F.2d 1293, 1298 (9th Cir.1992). There is no evidence to support the thesis that Silva won because of unusual, organized Anglo support or endorsement, or that Anglos preferred Silva, much less to secure dismissal of the lawsuit or that this was an election where Anglos voted for a safe minority candidate whom a minority group did not favor or favored only lukewarmly.

■ 35. The point of the "special circumstances" doctrine is that *isolated or occasional* minority successes may occur because of special circumstances that are unlikely to recur, making the success unrepresentative of most elections where Hispanic candidates usually lost and can be expected to lose in the future. This "special circumstances" doctrine has little applicability where minorities win frequently. *Valladolid v. City of National City*, 976 F.2d at 1298. Hispanics, *are* elected frequently in El Centro elections. Twelve Hispanics and five Blacks have been elected to the City Council. Four Hispanics have been elected to the El Centro High School District Board of Trustees. White bloc voting, in other words, does not *usually* defeat Hispanic preferred candidates, nor is it the case that Hispanics are unable to elect at-large.

36. Numerous cases have utilized exogenous elections to prove or disprove dilution. *Citizens for Better Gretna*, 834 F.2d at 502–03; *Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1209 (5th Cir.1989); *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1114, 1119 at n. 15) (5th Cir.1991). In *Garza*, 756 F.Supp. at 1335–36, the district court disregarded County elections and relied entirely on exogenous elections for Congress, State Assembly and State Senate for its findings on racially polarized voting.

37. Even more squarely on point is *Rangel v. Morales*, 8 F.3d 242 (5th Cir.1993), where a district court was reversed for fail-ure to consider several exogenous elections in which Hispanic candidates had won. Also, in the 1991 *Westwego* decision, experts for both sides testified that "the degree of racial polarization of the Westwego electorate *should not vary* between exogenous and indigenous elections." 946 F.2d at 1114 (emphasis added).

E. *Plaintiffs Have No Influence Claim.*

■ 38. Plaintiffs also assert a Section 2 "influence" claim as well as a "dilution" claim. This claim is without merit. First, plaintiffs have not demonstrated an inability to elect at-large. Thus, their "influence" claim cannot save their case. If plaintiffs have the ability to elect at-large, that will defeat both their "influence" and their "dilution" claims.

39. Second, Hispanics plainly have "influence" in the at-large system. They elected Silva in 1993 and Duggan in 1989 who were not Anglo preferences. They frequently have elected candidates to City Council and High School District elections. They are a majority of the voting age citizens in El Centro and 43% of all registered voters.

40. Third, courts have not sanctioned "influence" claims. *Skorepa*, 723 F.Supp. at 1391–92; *McNeil*, 851 F.2d at 947; *Romero*, 665 F.Supp. at 864, *aff'd* 883 F.2d 1418, 1424; *Latino Political Action Committee v. City of Boston*, 784 F.2d at 412; *Nixon v. Kent County, Michigan*, 790 F.Supp. 738, 746 (W.D.Mich.1992). *See also Hays v. State of Louisiana*, 839 F.Supp. 1188, 1196–97 n. 21 (W.D.La.1993) (criticizing Department of Justice for activist role in pressing for influence districts which have no "ability to elect"). The Supreme Court declined to address influence claims in *Thornburg*. 478 U.S. at 46, n. 12, 106 S.Ct. at 2764, n. 12. Influence claims received a thoroughgoing rejection in *Turner v. Arkansas*, 784 F.Supp. 553, 567–570 (E.D.Ark.1991) (three judge court), which the Supreme Court summarily affirmed, 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992). The Supreme Court repeatedly has declined to address influence claims in recent cases. *Voinovich v. Quilter*, 507 U.S. at 154, 113 S.Ct. at 1155; *Growe v.*

*Emison,* 507 U.S. at 41, n. 5, 113 S.Ct. at 1084, n. 5; *Holder v. Hall,* —— U.S. at —————— esp. n. 8, 114 S.Ct. at 2595–96 esp. n. 8 (Thomas concurrence); *Johnson v. De Grandy,* —— U.S. at ———–——, 114 S.Ct. at 2655–56.

41. Fourth, single member districts are harmful to the interests of Black voters in El Centro who frequently have elected their preferred candidates. Plaintiffs claim that Blacks are too small in number to have any claim under Section 2. Yet Black voters undoubtedly have "influence" under El Centro's at-large election system, as they frequently have elected their candidates of choice. If plaintiffs have an "influence" claim under Section 2, so do Blacks.

Having made the above findings of fact and conclusions of law, the Court hereby ENTERS JUDGMENT for defendants and against plaintiffs.

IT IS SO ORDERED.